490 F.2d 155
 MARBURY-PATTILLO CONSTRUCTION COMPANY, INC., Plaintiff-Appellee,
v.
BAYSIDE WAREHOUSE COMPANY, Defendant-Third Party
Plaintiff-Appellant, v. The AETNA CASUALTY AND SURETY
COMPANY, Third Party Defendant-Fourth Party
Plaintiff-Appellee, v. D. H. MARBURY, III, and A. F.
Pattillo, et al., Fourth Party Defendants.
 No. 72-1863.
 United States Court of Appeals, Fifth Circuit.
 Feb. 25, 1974.
 
 Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.
 COLEMAN, Circuit Judge:
 
 
 1
 After a thirteen day jury trial, this warmly contested diversity litigation resulted in a judgment for $60,000 in favor of Marbury-Pattillo Construction Company, Inc., (Marbury) against Bayside Warehouse Company, Inc., (Bayside) as the balance due and unpaid for the construction of four steel 500,000 bushel capacity grain storage tanks on the Mississippi River at Reserve, Louisiana. Although strongly urged to the contrary, we detect no reversible error in the proceedings below. The judgment of the District Court will, in all respects, be affirmed.
 
 
 2
 The agreed price for the work was $1,185,000. It is undisputed that of this amount Bayside withheld the payment of $60,000. The basic issue was whether this action had legal justification. This necessitates, first, an outline of the facts, stated in the light most favorable to the jury verdict, Hanover Fire Insurance Company v. Sides, 5 Cir., 1963, 320 F.2d 437; Gulf Oil Corporation v. Griffith, 5 Cir., 1964, 330 F.2d 729.
 
 
 3
 Prior to the commencement of the construction in question, Marbury had completed work at the same location on a much larger concrete grain storage facility for the South Louisiana Port Commission. That facility had been leased to Bayside, as operator. In June, 1968, Bayside decided to construct additional grain storage tanks. No final designs, plans, or specifications were in existence but the desired tank capacities were known, which, in turn, indicated the needed diameter and depth of the tanks. The real problem was that they were to be constructed on the unstable soil immediately adjacent to the Mississippi River, something the parties knew plenty about from the recently completed construction of the concrete grain storage tank facilities. In any event, using a fully pile supported construction approach, bids were solicited by telephone from five firms. Marbury submitted a bid of $1,800,000. This was rejected as too costly.
 
 
 4
 In the meantime, Bayside had obtained two subsoil investigation reports, one from Gore Engineering Company (June 14, 1968) and the other from Eustis Engineering Company (July 25, 1968). These reports indicated that borings encountered ground water only four feet from the surface. Both reports clearly stated that in the absence of full piling support there would be settlement in the storage tank floors-- the only question being how much and how soon it would occur.
 
 
 5
 Armed with this report, Bayside determined to proceed with construction of a type which would only be partially pile supported. The Gore and Eustis reports were passed on to Marbury and that organization was asked to reduce its former bid price by furnishing design drawings for a facility of the desired type.
 
 
 6
 On August 6, 1968, Marbury submitted to Bayside a letter proposal, accompanied by specifications and outline drawings, for the design and construction of a facility which would have piling only under the tunnels and beneath the concrete ring girders of the storage tanks, at a cost of $1,185,000. On August 9 Bayside accepted the proposal by letter. This letter began with the statement, 'This will authorize you to proceed with the work covered by your proposal dated August 6, 1968, for the design and construction of four (4) 500,000 bushel capacity steel grain storage tanks with related equipment as stated therein . . .. A formal contract and confirmation of the work will be executed at the earliest possible date.' Work began immediately.
 
 
 7
 Some two or three months elapsed before Bayside's attorneys drafted the 'formal' contract mentioned in the letter of acceptance. It was backdated to August 9, Bayside signed it in Memphis, and Marbury signed it in Birmingham. By that time, the piling under the tunnels and ring girders had been driven, the excavation done, and 65% Of the concrete work completed.
 
 
 8
 On December 21, 1970, after this litigation was begun, but nearly two years before the trial thereof, Bayside sold the Marbury-constructed facilities to the South Louisiana Port Commission for $1,940,400. The sale to the Port Commission was based on a professional appraisal which, taking the tank floors into consideration, had fixed the value of the facilities at $2,135,140 as of the time the last of the four tanks were completed.
 
 
 9
 As the soil tests predicted, there was settlement in that portion of the steel tank bottoms rested on soil not supported by piling. This caused Bayside to withhold payment of $60,000 of the contract price. Marbury brought suit for the money and gained the jury verdict. Bayside brings the appeal.
 
 
 10
 The amended complaint, seeking recovery of $60,000,000, was met with a motion for change of venue from the Northern District of Alabama to the Eastern District of Louisiana, New Orleans Division, pursuant to 28 U.S.C. 1404(a).[1] When this motion was overruled, Bayside answered and counterclaimed for the sum of $160,500 liquidated damages for failure to complete the tanks by the stipulated contract dates, plus $71,445.90 as the alleged cost of placing the tanks and related facilities in satisfactory condition in accordance with the contract specifications. Bayside also filed a third-party complaint against Aetna Casualty and Surety Company, the surety on Marbury's construction contract. Both claims were to be credited with the $60,000 withheld from Marbury. Marbury answered the counterclaim and Aetna answered the third-party complaint. On June 23, 1971, there was a pretrial hearing, at which the issues were identifed.
 
 
 11
 After this pretrial hearing, and although Bayside had already sold the tanks for a sum 60% In excess of the original contract price, it filed, on July 8, 1971, an amended counterclaim and third-party complaint, demanding recovery in the sum of $1,235,000 as the cost necessary to 'place the said tanks and related facilities in satisfactory condition in accordance with Marbury-Pattillo contractual undertaking'. Therefore, the demand against the contractor and its surety was increased to $1,342,208.19, plus interest and cost, subject to credit in the amount of $60,000.
 
 
 12
 Aetna then filed a fourth-party complaint plaint against D. H. Marbury and others for indemnity under its surety agreement.
 
 
 13
 In this rather complicated posture the case went to trial before a jury, producing a transcript of 2,447 pages and the result already indicated.
 
 
 14
 It may be said, with little pause, that the jury verdict finds ample support in the evidence. The only thing for us to determine is whether the verdict was infected by reversible error in the conduct of the trial. We proceed to an evaluation of Bayside's assignments of error.
 
 
 15
 First, it is argued that the District Court erred in the denial of the motion for a change of venue. To prevail on this argument, Bayside must show that the action of the District Court amounted to an abuse of discretion, Nowell v. Dick, 5 Cir., 1969, 413 F.2d 1204; Garner v. Wolfinberger, 5 Cir., 1970, 433 F.2d 117.
 
 
 16
 The motion was supported by one affidavit which identified nine witnesses, including experts, Louisiana residents, as having material knowledge concerning the design and construction of the tanks which were the subject of the contract in controversy. Marbury's counter-affidavit set out the substance of the testimony expected of seven identified individuals within reach of subpoenas issued in the district where the suit was filed. The motion and the response raised only an issue as to whether nine witnesses should travel from New Orleans to Birmingham or seven witnesses should travel the route in reverse. This fails of a substantial question as to an abuse of judicial discretion in the denial of the motion.
 
 
 17
 Bayside relies, however, on Koehring Company v. Hyde Construction Company, 5 Cir., 1964, 324 F.2d 295, reversing the denial of a change of venue in a suit by a Mississippi company against a Wisconsin corporation concerning the allegedly defective construction of a concrete plant and cooling facilities on the Arkansas River in the State of Oklahoma. We do not consider Koehring apposite, however, for the reason that one of the chief factors there was the distinctly possible necessity of an on-site inspection of the construction. In its motion, however, Bayside was content to say only that 'it may be invaluable for the jury to make a physical inspection', not that it