**RIEGEL FIBER CORPORATION,**
**Plaintiff-Appellant,**

v.

**ANDERSON GIN COMPANY et al.,**
**Defendants-Appellees.**

**RIEGEL FIBER CORPORATION,**
**Plaintiff-Appellant,**

v.

**ELLIS BROTHERS et al.,**
**Defendants-Appellees.**

Nos. 74–2120, 74–2121.

United States Court of Appeals,
Fifth Circuit.

May 9, 1975.

Bennett L. Kight, Charles A. Shanor, Atlanta, Ga., for plaintiff-appellant.

Neal P. Gillen, Walter H. E. Jaeger, Washington, D. C., for American Cotton Shippers Ass'n, amicus curiae.

Arthur Burns, James F. Hinton, Gadsden, Ala., for Baker Bros. and others.

Jack W. Torbert, Gadsden, Ala., for Coley defendants.

Hugh Reed, Jr., Centre, Ala., Frank M. Bainbridge, Birmingham, Ala., for Anderson and Ellis.

Herbert D. Jones, Jr., Anniston, Ala., for Sharp and others.

William J. Baxley, Atty. Gen., Myron H. Thompson, Asst. Atty. Gen., Montgomery, Ala., for State of Ala., amicus curiae.

Before THORNBERRY, CLARK and ROSENN,* Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal comes from a judgment entered pursuant to an order of the district court, sitting without a jury, granting appellees' motion for involuntary dismissal of appellant's case. The questions presented are, first, did the court correctly hold that certain contracts on which appellant brought suit failed to satisfy the Alabama statute of frauds, and second, did the court err in holding that appellant's failure to qualify to do business in Alabama could not, consistently with the Commerce Clause of the United States Constitution, bar enforcement of its contracts. We answer no to both questions and accordingly reverse and remand.

## I.

In late March 1973 Riegel Fiber Company, whose headquarters are in Trion,

* Of the Third Circuit, sitting by designation.

Georgia, entered into certain "forward" contracts for the sale of cotton with the Alabama ginner-defendants, Ellis Brothers and Anderson Gin Company.[1] After negotiations the parties agreed on a price of $.32 a pound. Contract cotton was to come from two sources. The owners of the ginning companies grow cotton as well as gin it, and they agreed to sell Riegel a portion of their own contemplated[2] production. To provide the major portion of the cotton called for by the contracts, however, the ginners had earlier entered into separate contracts with a number of individual Alabama cotton farmers, who promised to sell portions of their cotton production to Ellis and Anderson—also at $.32 a pound. These contracts were executed on forms provided to the ginners by Riegel,[3] and it is undisputed that all the farmers knew that Riegel would be the ultimate buyer of their cotton. The commercial rationale for this sale and resale arrangement is not entirely clear, but nothing in the record contradicts Riegel's explanation that it allowed the company to take advantage of the ginners' familiarity with local farmers.

During the spring and summer of 1973 the price of cotton rose dramatically. By October 1973 the parties stipulated that the market price of the type of cotton called for by the contracts had reached $.81 a pound. As the Supreme Court has rather mildly put it, "This situation may generate a strong economic incentive for . . . [the farmer] to breach his contract and sell the cotton elsewhere." Allenberg Cotton Co., Inc. v. Pittman, *supra*, 419 U.S. at 26 n.8, 95 S.Ct. at 264 n.8, 42 L.Ed.2d at 202 n.8. When Riegel's president first became aware of rumblings among the farmers, he went to Alabama and told them that Riegel intended to enforce its contracts. Learning later, however, that this warn-

ing had fallen on less than receptive ears, Riegel brought suit against both Ellis and Anderson seeking to have the contracts declared valid and asking that they be specifically enforced.[4] These suits named as additional defendants the individual farmers whose production Anderson and Ellis had agreed to purchase and then re-sell to Riegel.

Upon appellant's request, the district court entered a preliminary injunction directing the defendants to deliver to Riegel all cotton provided for by the contracts, conditioned upon Riegel's posting a $1,725,000 bond to secure payment of costs, damages, and attorney's fee in the event that the contracts were held invalid. Both sides concede that this injunction has been fully complied with. After the normal pretrial maneuvering by the parties, the trial judge ordered a separate trial, pursuant to Fed.R.Civ.P. 42(b), on the issue of whether Riegel's failure to qualify to do business in Alabama barred it from suing on its contracts. At the conclusion of the hearing on that question the judge found that Supreme Court cases interpreting the Commerce Clause required him to hold that the Alabama qualification statutes could not be applied to Riegel on the facts presented. Subsequently, following a pretrial conference, the district court entered an order setting the following issues for separate trial:

(a) whether the plaintiff is entitled to specific enforcement of the master contracts to the extent of the cotton produced by the ginner defendants (or voluntarily furnished to the ginner defendants by other farmers), this issue to include questions as to due execution of the master contracts, the enforceability thereof under Ala. UCC § 2–201 (formal requirements; statute of frauds) and § 2–302 (unconscionability, and the remedy of specific per-

---

1. The Supreme Court has recently explained the function of "forward" contracts in the agricultural commodity market. Allenberg Cotton Co. v. Pittman, 1974, 419 U.S. 20, 26–29, 95 S.Ct. 260, 264–65, 42 L.Ed.2d 195.

2. No crops were planted by any of the appellees here until some time in April, 1973.

3. In fact, the forms used for the ginner-farmer contracts were identical to the forms used for the Riegel-ginner contracts.

4. Riegel originally brought separate suits against Anderson and Ellis, but they were consolidated for trial and appeal.

formance) including general principles of equity and problems of identification under Ala. UCC § 2–716.

(b) whether the individual contracts (assuming their validity otherwise) are enforceable under Ala. UCC § 2–201 and 2–302.

(c) whether the plaintiff has standing to enforce the individual contracts (if otherwise valid and enforceable), either under a theory of assignment, of third party beneficiary, or of being a party to the contract as a disclosed principal.

App. at 123–24. Trial began on December 26, 1973, and the next day the trial judge granted the defendants' motion for involuntary dismissal at the close of plaintiff's evidence pursuant to Fed.R. Civ.P. 41(b) ("on the ground that upon the facts and the law the plaintiff has shown no right to relief"). Stating his conclusions orally from the bench, the district judge held (1) that the Riegel-ginner contracts (the "master" contracts) did not contain a quantity term sufficient to satisfy the Alabama statute of frauds; (2) that integration clauses in the master contracts prohibited the court from looking at extrinsic evidence to aid in interpreting the contracts so as to render them valid and enforceable; and (3) that Riegel had no standing to enforce the contracts between the ginners and the farmers (the "individual" contracts). Appellant argues, and we agree, that each of these holdings is incorrect.

## II.

For the sake of clarity we will first consider Riegel's status with regard to the "individual" contracts. The district court rejected all three theories put forward by Riegel to establish its interest in those contracts: assignment, third party beneficiary, and enforceable "special property interest" as granted by U.C.C. § 2–501(1) and § 2–722(a). Because we think the evidence conclusively supports appellant's right to enforce the individual contracts as a third party beneficiary, we do not pause to consider the merits of Riegel's other theories.

In United States Pipe and Foundry Co. v. United States Fidelity and Guaranty Co., 5th Cir. 1974, 505 F.2d 88, 90 we noted that

Under Alabama law . . . for a contract to be considered made for the benefit of a third person "the contract must have been intended for the direct benefit of the third person, as distinguished from a mere incidental benefit to him." Anderson v. Howard Hall Co., 278 Ala. 491, 493, 179 So.2d 71, 73 (1965).

Moreover, once it is established that a party is a third party beneficiary, he is fully entitled to enforce the promise made for his benefit. Anderson v. Howard Hall Co., *supra*, 179 So.2d at 72. The district court disposed of Riegel's third party beneficiary argument with the following reasoning:

There is no basis for concluding that the plaintiff was a third party beneficiary of the individual contracts. They provide that the individual farmers were to sell to the ginner defendants with ultimate delivery at Trion in Georgia to Riegel Fiber Corporation, but by other terms of the same agreement it is made clear that that was to be a sale and a delivery to the ginner defendants. There is nothing that indicates *in the contract* that the ginner defendants would not have been free so far as the individual contracts with the farmers are concerned to have sold to some other manufacturer other than Riegel.

App. at 217 (emphasis added). The language that we have emphasized discloses the source of the lower court's error. In Alabama, courts are not limited to the face of the writing when deciding whether the parties intended directly to benefit a third party; they may also hear evidence on the circumstances surrounding the making of the contract. Anderson v. Howard Hall Co., *supra*, 179 So.2d at 75; Mutual Benefit Health & Acc. Ass'n of Omaha v. Bullard, 270 Ala. 558, 567, 120 So.2d 714, 723 (1960). Whatever information may or may not be derivable from the face of the indi-

vidual contracts here, the pleadings and the evidence concerning the circumstances of the execution of these contracts leave no possible doubt that in substance Riegel was making a direct purchase from the farmers, with the ginners acting only as a form of accommodation party.[5] Accordingly, we hold that appellant is entitled to enforce the individual contracts as a third party beneficiary thereof. The question remains, however, whether this right is of any value, since the district judge held that the master contracts failed to satisfy the Alabama statute of frauds and strongly implied that if necessary he would have reached the same conclusion concerning the individual contracts.

Our analysis begins, as did the district court's, with Code of Alabama Title 7A, § 2–201, the UCC's statute of frauds for the sale of goods.[6] Section 2–201(1) provides:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon

but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

As Official Comment 1 to § 2–201 notes:

> Only three definite and invariable requirements as to the memorandum are made by this subsection. First, it must evidence a contract for the sale of goods; second, it must be "signed", a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity.

Appellees do not question that the detailed and signed written contracts involved in this case satisfy the first two requirements set out in the comment. Nor can they well deny that the writings contain a quantity term, since they plainly do.[7] Instead, appellees apparently argue that because the quantity terms included in the written forms are allegedly too indefinite to support enforcement of the underlying agreement, the writings in legal effect have no quantity term at all. *Cf.* Doral Hosiery Corp. v. Sav-A-Stop, Inc., E.D.Pa.1974, 377 F.Supp. 387, 389–90. Accordingly, appellees contend, the district judge correctly held that § 2–201 barred enforcement of the contracts.

To the contrary, we think that the lower court erred in relying on § 2–201.[8] The statute of frauds is only one

---

**5.** We see no need to rehash the evidence demonstrating the parties' understanding of the true nature of these transactions. Instead we merely note, first, that the ginners made no profit on the contracts with the farmers and second, that they testified that the farmers understood that Riegel would be the ultimate buyer of the cotton. As the district court found when discussing the Commerce Clause issue, the ginners' role might be characterized as "in the nature of a common or joint agent or broker."

**6.** Title 7A, § 2–105(1) provides in part that: " 'Goods' also includes . . . growing crops." Unless otherwise noted, all references to the Uniform Commercial Code will be to the Alabama version.

**7.** Typical is the Riegel-Ellis contract:

    1. On the terms and conditions and at the prices set forth below, Buyer agrees to pur-

chase and take delivery from Seller, and Seller agrees to sell and deliver to Buyer, all the acceptable cotton produced during the crop year 1973 on the following acreage, and none other:

| No. of Acres | Farm No. | County | Allotment in Name Of | Projected Yield 1973 |
|---|---|---|---|---|
| 4,222 | | Cherokee & Calhoun Counties, Alabama | Various | 500 Lbs. Per Acre |

**8.** We do not dispute the accuracy of most of the facts found by the district judge. Our disagreement goes primarily to the legal conclusions he draws from those facts and to his failure to make findings on certain matters we think significant under a correct view of the law.

of many potential barriers to the enforcement of agreements. As the language of § 2–201 reveals, the statute's overriding purpose is "to indicate that a contract for sale has been made between the parties." It is a device to prevent fraudulent and perjurious assertions of a contract where none in fact existed; the writing evidencing the parties' contractual status need not, and often does not, state all the terms of the agreement.[9] In the instant case the evidence is overwhelming and uncontradicted that the parties intended to and did enter into a contract.[10] They reduced their agreement—in fact, as the district judge found, they reduced their entire agreement—to written form: the writings were signed, attested, and contained a quantity term. Moreover, for the limited purposes of meeting the technical statute of frauds requirement embodied in § 2–201 the accuracy of the quantity term is immaterial.[11] *Cf.* West Point-Pepperell, Inc. v. Bradshaw, M.D.Ala.

1974, 377 F.Supp. 154, 158–59. Plainly, the real issue in this case is not whether these contracts satisfy § 2–201,[12] but whether the quantity term in the agreement the parties undeniably made—as reflected in the signed writings—is too indefinite to support judicial enforcement. Section 2–201 itself does not purport to address this question. The unspoken assumption in that section is that when court and litigants turn to the writing for the quantity term, no dispute will remain that the statute of frauds has been satisfied; hence, the agreement is no different from any other contract to which the Code applies. Thus, for the applicable standards of definiteness in contract provisions we must have recourse to Code sections other than § 2–201.

Appellant places principal reliance on U.C.C. § 2–306, which relates to output and requirements contracts and is the primary "gap-filler" in the

---

9. *See* Port City Construction Co., Inc. v. Henderson, 48 Ala.App. 639, 266 So.2d 896, 900 (1972); U.C.C. § 2–201, comment 1; 2 Corbin, Contracts § 498, at 680–81 (1950).

10. Although at some places in their pleadings and testimony appellees refer to "alleged" contracts, a careful reading of their answers and the evidence compels the conclusion that they admitted *making* these contracts within the meaning of § 2–201(3)(b):

A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable   .   .

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted   .   .   .   .

Nevertheless, appellees clearly made no separate admissions concerning the quantity stated in the contracts, so the final clause of § 2–201(3)(b) is of no aid to us here. Consequently, appellees' admissions simply reinforce the conclusion that we also derive from looking at the writings alone; *i. e.* that this case has nothing to do with the statute of frauds.

11. "The only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated." § 2–201, comment 1. That is, the litigant seeking to enforce the contract bears

the risk if the writing entitles him to less than he and his opponent actually agreed upon, *see* White & Summers, Handbook of the Law Under the Uniform Commercial Code § 2–4, at 54 (1972), but such inaccuracy does not alone make the writing insufficient for purposes of the statute. White and Summers plausibly suggest that the language of § 2–201 itself, as opposed to the comments, can be read to require no quantity term at all. *Id.* at 51 n.44. Under this reading any quantity term in the writing would control, but if no such term were present the party seeking enforcement could establish it by parol along with all the other provisions of the agreement. Indeed, the quantity term requirement does appear to offer little in aid of the primary purpose of the statute, *i. e.* discouraging fraudulent oral assertions of nonexistent contracts. Once a party alleges that the agreement took place and proffers a signed writing to prove it, surely he is no more likely to lie about the agreed quantity term than about price, time of performance, or any other material term that § 2–201 expressly allows to be omitted from the writing. Nevertheless, the Code's authors apparently thought it necessary to protect parties against this one brand of perjury. *Id.* at 52–53. In any event, appellees do not contend that the "amount stated" in the writings is definite and that Riegel is attempting to force them to sell more than that amount.

12. *Cf.* Cox v. Cox, 292 Ala. 106, 289 So.2d 609 (1974).

Code for quantity terms.[13] We need not reach the question whether these contracts fall within the reach of § 2–306, however, because we think appellant presented ample evidence that the quantity terms in the master and individual contracts—viewed as requiring delivery of various pounds of cotton [14]—meet the standards of definiteness required by the Code for enforceability.[15] Section 2–204(3) states the general rule:

> Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

The official comment to this section adds that "commercial standards on the point of 'indefiniteness' are intended to be applied." Thus, we view our inquiry as limited to the question whether these contracts contained quantity terms acceptable to the majority of buyers and sellers knowledgeable in the cotton trade.

Unfortunately, the parties directed their arguments more to technical contract doctrine than to the commercial reasonableness of the method used in these agreements to designate quantity. A review of the record, briefs, and argument of counsel convinces us, however, that the quantity terms as stated in the

**13.** In two recent cases involving cotton contracts substantially similar to those involved here, the Georgia Supreme Court relied upon § 2–306 in rejecting the growers' contentions that the agreements were too indefinite to be enforced. R. L. Kimsey Cotton Co. v. Ferguson, 233 Ga. 962, 214 S.E.2d 360 (1975); Harris v. Hine, 232 Ga. 183, 205 S.E.2d 847 (1974). *See also* Port City Construction Co., Inc. v. Henderson, *supra*, 266 So.2d at 900; Owens v. Clow Corp., 5th Cir. 1974, 491 F.2d 101, 103 n. 2 (applying Alabama law).

**14.** Riegel points out that simply by multiplying the number of acres stated in the contracts times the estimated yield, one derives a quantity term stated in pounds of cotton. Furthermore, citing U.C.C. § 2–306(1), the company contends that any slight variation in yield from acre to acre is immaterial, since in no event would the contract be enforceable beyond a quantity not unreasonably disproportionate to the estimated yield stated in the contract. Although § 2–306(1) concerns output and requirements contracts, we think that the Code's general good faith provision, U.C.C. § 1–203, accomplishes the same result here where a contractual quantity is subject to "natural" variations. Section 1–203 would also help obviate any difficulty with those individual contracts where no estimated yield is stated.

**15.** We have already held that the two "levels" of contracts involved here can be viewed only as different parts of one contractual transaction. Any imprecision in the master contracts regarding which farmers have bound themselves through Anderson and Ellis to sell to Riegel was resolved by introduction of the individual contracts and by the testimony adduced at trial. This evidence was admissible both to explain the quantity terms in the master contracts and to allow Riegel to prove its interest in the individual contracts. Neither the parol evidence rule nor the so-called merg-

er or integration clauses in the contracts affect the admissibility of the evidence. The parol evidence rule, except in certain circumstances, forbids the parties to supplement the terms stated in the writing evidencing the contract. It does not, however, forbid the admission of extrinsic evidence to explain the meaning of words contained in the writing. *See* Port City Construction Co., Inc. v. Henderson, *supra*, 266 So.2d at 900; Marbury-Pattillo Constr. Co., Inc. v. Bayside Warehouse Co., 5th Cir. 1974, 490 F.2d 155, 159 (applying Alabama law); 3 Corbin, Contracts § 579, at 412–13 (1960). The line between explanation and supplementation is narrow and occasionally difficult to draw, but in this case it is clear that plaintiff offered its evidence for the former purpose and not for the latter. The trial judge seemed to recognize this, but felt that the integration clauses nevertheless required him to refuse to consider the evidence. These clauses state in bold print:

> BOTH PARTIES HAVE CAREFULLY READ AND FULLY UNDERSTAND THE TERMS AND PROVISIONS OF THE FOREGOING CONTRACT, WHICH REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND FURTHER UNDERSTAND THAT THERE MAY BE NO MODIFICATION OF THIS CONTRACT EXCEPT IN WRITING.

Again, however, this language on its face only prohibits the parties from introducing evidence modifying the writing to which they have agreed; it does not bar evidence explaining the words used or the circumstances surrounding execution of the contracts. *See* 3 Corbin, Contracts § 539, at 77–78 (1960). We have been cited to no cases suggesting that Alabama courts would refuse to admit evidence offered to aid in the interpretation, as opposed to the modification, of "integrated" contracts.

contracts can meet the Code's test for definiteness. Significantly, the record is clear that appellees themselves supplied the actual quantity provisions on the forms tendered by Riegel. The individual farmers provided the farm numbers and the acres to be covered by their contracts. The ginner defendants totalled the acreage in the individual contracts, added their personal acreage, and inserted the resulting total acreage into the master contracts. The evidence shows no objections made by any appellee to the forms at the time the contracts were entered into; likewise, it reveals no attempt by appellees to insert what they now argue would be more definite terms, even though they clearly had the opportunity to do so.[16] Moreover, although we do not give controlling weight to this factor, it cannot be ignored that appellees successfully identified and allocated

contract and non-contract cotton when required to do so by the lower court's injunction.

The district court relied heavily on the impossibility of determining from the face of the master contracts the specific fields covered by the agreements. The judge likewise expressed doubt that the individual contracts would help much in locating this precise acreage. Yet we find no evidence that any of the parties believe that such specificity is *commercially* necessary or even desirable. For its part, Riegel is apparently willing to rely to a large extent on the farmers' good faith and commercial reasonableness in choosing which of their acres are to be used to grow contract cotton.[17] Likewise, the record contains no hint of why the individual farmers or the ginners might prefer as a normal practice to contract as to rigidly specified fields.[18]

16. As the Court of Claims recently noted, "The law rejects post facto claims that agreements are too indefinite for enforcement, where the parties knew what each of them was to do under the contract and some standard exists to measure performance." Saul Bass & Associates v. United States, Ct.Cl.1974, 505 F.2d 1386, 1394. Appellees' readiness to execute these agreements is strong evidence that they knew what they had to do to meet their contractual obligations.

17. There is little reason for them to do otherwise. Quality control is taken care of by the provision that Riegel will buy only "acceptable" cotton, as carefully defined in the contract. In addition, by stating quantity in terms of pounds or bales of acceptable cotton Riegel arguably avoids any hazards created by the varying productivity of specific fields.

18. Appellees have pitched almost their entire argument on "unique" technical faults allegedly present in the particular arrangements chosen by Riegel here. They offer little to buttress their argument except hypotheticals showing a supposed lack of mutuality in the agreements. When asked directly at oral argument whether it is commercially important to know the specific fields covered by cotton contracts, counsel for the farmers responded only that it was important to *these* contracts. Significantly, the testimony of Mr. Ellis revealed with regard to his individual cotton acreage that (1) he had no specific fields in mind when he signed the contract; (2) he never designated any fields as "contract" acres; (3) his intent when contracting was to sell half of his production; and (4) when his production

turned out to be less than he anticipated, he nevertheless delivered under the contract half of the cotton he did produce without protest on Riegel's part. Appendix at 169–71.

We admit to some confusion concerning why the column for farm numbers was inserted into the form contracts if Riegel intended only to obtain a given quantity of cotton; that object could have been achieved by specifying only the number of acres and the estimated yield. Although the record is not entirely clear, we think that one plausible explanation is that Riegel's forms were drawn to allow a stricter contract than Riegel in fact required of the farmers. That is, Riegel could have contracted as to specific farms but preferred a more flexible arrangement. *See* note 17, *supra.* This theory is bolstered, we believe, by certain facts brought out at trial. Riegel obtained the completed individual contract forms from Ellis and Anderson only when preparing for this litigation. Presumably, then, if the ginners had delivered the quantity of cotton required by the master contracts, Riegel never would have known on which exact farms the cotton was produced. Second, the following testimony of Mr. Ellis, one of the ginner-defendants, suggests the possibility that the farmers may have provided the farm numbers only because they believed the forms required it of them:

Q.: How was the information pertaining to each of the side [individual] contracts . . . that is the filling in of the blanks, how was that done?

A.: You're referring to the farmer's name, the farm number, the acres?

We think Riegel's evidence clearly makes out a prima facie case that the quantity terms in the master contracts, as well as in the individual contracts, conform to acceptable practice in the cotton trade. *Cf.* R. N. Kelly Cotton Merchant, Inc. v. York, M.D.Ga.1973, 379 F.Supp. 1075, 1079, aff'd, 5th Cir. 1974, 494 F.2d 41; Taunton v. Allenberg Cotton Co., Inc., M.D.Ga.1973, 378 F.Supp. 34, 39; Mitchell-Huntley Cotton Co., Inc. v. Lawson, M.D.Ga.1973, 377 F.Supp. 661, 663. Consequently, the district judge erred in granting appellees' motion for involuntary dismissal under Fed.R.Civ.P. 41(b). *See* Ingraham v. Wright, 5th Cir. 1974, 498 F.2d 248, 265, rehearing en banc granted.

### III.

Appellees seek to support the judgment below on the alternative ground that the district court erred in concluding that the Commerce Clause of the Federal Constitution would be violated by a decision that Riegel's contracts were unenforceable because of its failure to qualify to do business in Alabama. Appellant questions whether this issue is properly before us, because appellees took no cross-appeal assigning that ruling as error. However, since appellees seek no modification of the judgment of the lower court, no cross-appeal is necessary. "[I]t is . . . well established that the prevailing party below need not cross-appeal to entitle him to support the judgment in his favor on grounds expressly rejected by the court below." Swarb v. Lennox, 1972, 405 U.S. 191, 92 S.Ct. 767, 773, 31 L.Ed.2d 138 (White, J., concurring). *See also* 9 J. Moore, Federal Practice ¶ 204.11[2], at 930 (1973).

After the parties filed their briefs, but before oral argument in this case, the Supreme Court decided Allenberg Cotton Co., Inc. v. Pittman, 1974, 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195. In *Allenberg* the Court reviewed a decision by the Mississippi Supreme Court holding that a Tennessee-based cotton buyer's transactions with a Mississippi cotton farmer were wholly intrastate in nature and thus that the Commerce Clause was not violated by its decision that the buyer could not recover damages for breach of a contract to deliver cotton as a consequence of its failure to qualify to do business in Mississippi. The nature of the transaction involved in *Allenberg* was described by the Supreme Court:

Appellant is a cotton merchant with its principal office in Memphis, Tenn. It had arranged with one Covington, a local cotton buyer in Marks, Mississippi, "to contract cotton" to be produced the following season by farmers in Quitman County, Mississippi. The farmer, Pittman, in the present case, made the initial approach to Covington, seeking a contract for his cotton; in other instances Covington might contact the local farmers. In either event, Covington would obtain all the information necessary for a purchase contract and telephone the information to appellant in Memphis, where a contract would be prepared, signed by an officer of appellant, and forwarded to Covington. The latter would then have the farmer sign the contract. For these services Covington received a commission on each bale of cotton delivered to appellant's account at the local warehouse. When the farmers delivered the cotton, Covington would draw on appellant and pay them the agreed price.

419 U.S. at 22–25, 95 S.Ct. at 262–63, 42 L.Ed.2d at 199–200 (footnotes omitted). The Court noted that standard forward cotton contracts, like the one in the case

---

Q.: Yes, sir.
A.: The individual farmer gave that information. . . .
Q.: All right, sir. Did you have any source of that information other than from the farmers themselves?
A.: No, sir.
Appendix at 172. Of course, we need not decide whether the farmers could on these facts supply Riegel only with cotton grown on the farms specified in the individual contracts, but we do think it significant that appellees do not contend that the written contracts required them to sell more cotton to Riegel than they subjectively intended.

before it, play a highly functional commercial role by helping to guarantee some measure of stability in the intricate interstate marketing mechanism for cotton. After reviewing some of its earlier cases construing the permissible reach of state regulation of interstate commerce, the Court concluded "that Mississippi's refusal to honor and enforce contracts made for interstate or foreign commerce is repugnant to the Commerce Clause." 419 U.S. at 32, 95 S.Ct. at 267, 42 L.Ed.2d at 205.

■ We have carefully examined each point urged by appellees in their attempt to distinguish this case from *Allenberg.* We are not convinced, however, that any slight factual variations present here are significant for purposes of the Commerce Clause. In *Allenberg* the Supreme Court manifested a special concern for the integrity of the "vast system of distribution of cotton in interstate commerce." There can be no dispute that the contracts in the case before us are part of that system. Consequently, we hold that the district court properly concluded that denial of Riegel's right to enforce these contracts because of its failure to qualify to do business in Alabama would violate the Commerce Clause.

## IV.

■ Because the district court erred in granting appellee's Rule 41(b) motion, we reverse its judgment and remand this case for further proceedings. Although the defendants must of course be allowed to present their evidence, the district court need not compel Riegel to offer again the evidence it has already introduced. Nevertheless, plaintiff should be allowed to supplement the present record, in chief or by rebuttal, with any evidence that could properly have been admitted at the first trial of these issues. *See* Ingraham v. Wright,

supra, 498 F.2d at 265; White v. Rimrock Tidelands, Inc., 5th Cir. 1969, 414 F.2d 1336, 1340 & n. 7; 5 J. Moore, Federal Practice ¶ 41.13[2], at 1152 (1973).[19]

Reversed and remanded for proceedings consistent with this opinion.

19. We take this opportunity to express again our dissatisfaction with the inconvenience that results from a promiscuous use of Rule 41(b) dismissals. *See* White v. Rimrock Tidelands, Inc., *supra,* at 1340. Except in unusually clear cases the district judge can and should carry the defendant's Rule 41(b) motion with the case—or simply deny it, since the effect will be the same—let the defendant put on his evidence, and then enter a final judgment at the close of the evidence.