Hillsborough-northern judicial district
No. 2000-705

PMC CORPORATION

v.

HOUSTON WIRE & CABLE COMPANY

Argued: February 6, 2002
Opinion Issued: May 10, 2002

*Orr & Reno, P.A.*, of Concord (*Richard B. Couser* and *Lisa Snow Wade* on the brief, and *Mr. Couser* orally), for the plaintiff.

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*Michael C. Harvell* and *Michael J. Lambert* on the brief, and *Mr. Harvell* orally), for the defendant.

DUGGAN, J. This is an appeal from a jury verdict in favor of the plaintiff, PMC Corporation (PMC), and a denial by the Superior Court (*Lynn*, J.) of the defendant's, Houston Wire & Cable Company (Houston), motion for judgment notwithstanding the verdict. Houston contends that the superior court erred in denying its motion for judgment notwithstanding the verdict because the writings at issue were insufficient to comply with the requirements of the statute of frauds contained in the Uniform Commercial Code, RSA ch. 382-A (1994), and that insufficient evidence existed for the jury to conclude that the parties intended to form a binding contract. We affirm.

This case arises out of the dealings between PMC, a supplier of thermocouple wire and cable, and one of its customers, Houston, a distributor of wire and cable products. In the early 1990s, Houston began purchasing thermocouple products from PMC. In 1994, PMC and Houston began discussions about entering into a relationship in which PMC would provide training on thermocouple applications and other services to Houston to assist it in selling thermocouple products directly to end users. In turn, PMC would become Houston's primary vendor of thermocouple products.

In late 1994, PMC's president, John Gehrisch, asked Houston to put its commitment to purchase primarily from PMC in writing. On January 4,

1995, Gehrisch wrote to Tom Adelman, vice president of operations at Houston, proposing a contract covering Houston's purchases of thermocouple wire and cable items. In the letter, Gehrisch requested a written commitment from Houston, in the form of a purchase order, to buy a minimum of $800,000 per year of thermocouple products to cover Houston's inventory for a three-year period. Gehrisch also requested a letter of intent from Houston confirming its recognition of PMC as its primary source for thermocouple products and confirming its intent to purchase thermocouple products totaling $2,000,000 in 1995, $3,000,000 in 1996, and $4,000,000 in 1997. This amount represented Houston's total purchases of thermocouple products to cover both its corporate inventory and branch requirements.

Regis Lageman, PMC's vice president, subsequently spoke to Adelman about the proposed contract. Adelman informed Lageman that Houston could not guarantee purchases of $800,000 per year. The parties, however, discussed PMC's need for a letter of intent from Houston so it could obtain leverage at its bank and so that PMC would have something to give to the bank when it was negotiating for capital to expand the factory.

On January 13, 1995, Lageman sent a draft of a revised agreement via facsimile transmission to Houston. The facsimile cover sheet explained that the draft was " 'an intent to purchase' that in no way locks [Houston] into purchases from PMC but merely indicates an intent." On January 17, 1995, Edward Holland, Houston's president, directed his secretary to retype on Houston's letterhead the revised agreement drafted by Lageman and to affix Adelman's signature to the agreement. The agreement began by stating, "[Houston] agrees in principal [sic] with the proposed agreement submitted by PMC January 4, 1995. We have reviewed that proposal and have added some additional details to finalize the 1995 purchasing agreement between [Houston] and PMC as follows . . . ." Some of the additional details were:

> 5.0 [Houston] expects to purchase in excess of $2,000,000 of thermocouple products in 1995. [Houston] recognizes PMC as a major thermocouple manufacturer and preferred supplier for this thermocouple business. While [Houston] cannot commit to exclusive purchase of this total from PMC, [Houston] recognizes PMC as a preferred supplier. As such, with competitive pricing, service, delivery, and the above rebate schedule PMC can expect to receive a major share of the total thermocouple business. It is not unrealistic to project total purchases by [Houston] from PMC to be in the $2,000,000 range in 1995.

> 6.0 Future business: With the commitment that PMC has made to help [Houston] grow its thermocouple business [Houston] is projecting future thermocouple business as follows:
>     1996 $3,000,000
>     1997 $4,000,000
> It is also [Houston's] intent to purchase the major portion of this product from PMC.

During trial, Gehrisch explained that he did not expect Houston to purchase one hundred percent of its thermocouple product from PMC, but, rather, Houston could purchase from other vendors on the rare occasions when PMC could not supply the product or could not match a competitor's pricing.

After this correspondence, Houston's orders from PMC began to decrease. During a meeting on February 21, 1995, Houston informed PMC that it was planning to purchase the bulk of its thermocouple products from Belden, a competing manufacturer.

In 1998, PMC initiated this lawsuit claiming, among other things, that Houston breached its contract with PMC and that Houston made negligent misrepresentations. The case culminated in a jury verdict in favor of PMC on its breach of contract and negligent misrepresentation claims. Houston moved unsuccessfully for judgment notwithstanding the verdict, or, in the alternative, to set aside the jury verdict. This appeal followed.

Houston first argues that as a matter of law, the writings in question were unenforceable under the statute of frauds because they failed to contain the required quantity element. Whether the superior court correctly concluded that the quantity element of the statute of frauds is met is a question of law that we review *de novo. See Byblos Corp. v. Salem Farm Realty Trust*, 141 N.H. 726, 729 (1997).

Pursuant to the Uniform Commercial Code's statute of frauds, a contract for the sale of goods of $500 or more is not enforceable unless in writing. *See* RSA 382-A:2-201(1). The statute of frauds requires that the writing be "sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . . ." *Id.* The official comments to the Uniform Commercial Code explain that to satisfy this requirement, a party need only produce a writing that: (1) evidences a contract for the sale of goods; (2) is signed by the party against whom it is to be enforced; and (3) recites a quantity term. *See* RSA 382-A:2-201 comment 1; *see also* 1 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 2-4, at 59 (4th ed. 1995). *But see Advent*

*Systems Ltd. v. Unisys Corp.*, 925 F.2d 670, 676-79 (3d Cir. 1991) (holding that a contract may be enforceable despite its omission of quantity term).

Houston does not question that the January 17, 1995 letter is sufficient to indicate a sale of goods and that it is signed by the party sought to be charged. Houston submits, however, that the writing is insufficient to satisfy the statute of frauds because it does not contain a definite quantity term. Although the letter stated that Houston expected to purchase a "major share" or "major portion" of its thermocouple products from PMC, Houston contends that these references to quantity are too indefinite to comply with the statute of frauds.

The January 17, 1995 letter projects thermocouple purchases in excess of $2,000,000 by Houston in 1995 and states that "with competitive pricing, service, delivery, and the above rebate schedule PMC can expect to receive a *major share* of the total thermocouple business." (Emphasis added.) The letter also projects Houston's future thermocouple purchases and states that Houston intends "to purchase the *major portion* of this product from PMC." (Emphasis added.) Houston argues that these quantity measurements are insufficient to satisfy the statute of frauds because they do not indicate a firm commitment by Houston to purchase a certain percentage or amount of its thermocouple from PMC. We disagree.

■ Although the statute of frauds requires a quantity term, the official comment to this provision of the Uniform Commercial Code states: "The required writing need not contain all the material terms of the contract and such material terms as are stated need not be *precisely* stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." RSA 382-A:2-201 comment 1 (emphasis added). The general rule among courts is that "when quantity is not precisely stated, parol evidence is admissible to show what the parties intended as the exact quantity but where the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing quantity term." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 794 (4th Cir. 1989) (quotations and ellipses omitted); *see also Alaska Ind. Fish. Mkg. Ass'n v. New England Fish Co.*, 548 P.2d 348, 352 (Wash. Ct. App. 1976); *Matter of Estate of Frost*, 344 N.W.2d 331, 334 (Mich. Ct. App. 1983). Therefore, so long as a quantity term exists in the agreement, the agreement need not fail because the quantity term is not precise. *See Matter of Estate of Frost*, 344 N.W.2d at 334.

■ In the instant case, the writing was not totally silent as to quantity because it referred to Houston's expectation to purchase a "major share"

or "major portion" of its thermocouple products from PMC. The terms "major share" or "major portion" express a quantity term, albeit an imprecise one. As noted above, the statute of frauds does not require precision. It only requires a quantity term sufficient to afford a basis for believing that the offered evidence rests on a real transaction, thereby satisfying the statute's primary purpose of preventing fraud and perjury in contract actions. *See* WHITE & SUMMERS, *supra* § 2-8, at 82. The terms "major share" or "major portion" are sufficient to afford such a basis, and, therefore, the superior court did not err in determining that the statute of frauds was satisfied and in admitting parol evidence to show what the parties intended as to the exact quantity.

Nonetheless, "[t]he statute of frauds is only one of many potential barriers to the enforcement of agreements." *Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784, 788-89 (5th Cir. 1975). The statute of frauds' overriding purpose is "to *indicate* that a contract for sale has been made between the parties." RSA 382-A:2-201(1) (emphasis added). Although we have concluded that the terms "major share" and "major portion" are sufficient to indicate that a contract for sale has been made, PMC was still required to persuade the trier of fact that the parties did make a contract and of the terms of that contract. *Cf.* WHITE & SUMMERS, *supra* § 2-4, at 58. In this case, one of the main issues for the jury to determine was whether there was sufficient evidence to reasonably determine the terms – including the quantity – of the contract. Under the Uniform Commercial Code, a contract for the sale of goods will not fail for indefiniteness if one or more terms in the contract are left open. *See* RSA 382-A:2-204(3). A party attempting to prove the existence of a contract, however, must persuade the trier of fact that there exists "a reasonably certain basis for giving an appropriate remedy." *Id.*

Houston asserts that because the parties did not enter into a valid requirements contract, the superior court improperly instructed the jury that a requirements contract could be used to measure the quantity of the goods to be sold. Houston further asserts that even if the instruction on the issue of requirements contracts was properly given, the instruction was incorrect as a matter of law because it failed to inform the jury that exclusivity between parties is a necessary prerequisite to a valid requirements contract.

█ A requirements contract is generally sufficient to supply a missing quantity term because it "measures the quantity by the output of the seller or the requirements of the buyer." RSA 382-A:2-306(1). To be valid, a requirements contract must: "(1) obligate the buyer to buy goods, (2) obligate the buyer to buy the goods exclusively from the seller, and (3)

obligate the buyer to buy all goods of a particular kind from the seller." WHITE & SUMMERS, *supra* § 3-9, at 154-55. Houston asserts that the superior court erred in giving the jury an instruction regarding requirements contracts because in this case, it was undisputed that Houston was not required to purchase its thermocouple products exclusively from PMC and, therefore, no valid requirements contract existed. Houston contends that "[a]s there was no written evidence that the parties intended to create a requirements contract under RSA 382-A:2-306, it was incorrect in the first instance for the Superior Court to give the jury an instruction on requirements contracts."

In instructing the jury on the law, the court gave the following instruction:

> A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of a contract. Even though one or more terms are left open, a sales contract does not fail for indefiniteness if the parties have intended to make a contract and if there is a reasonably certain basis for giving an appropriate remedy in the event of a breach of contract. Thus, parties may enter into a binding sales contract even if they do not specify the actual quantity of the goods to be sold but instead measure the quantity by the requirements of the buyer for the goods in question.

> In such a case, the quantity of goods to be sold is the actual requirements of the buyer, *or such proportion thereof as was reasonably contemplated by the parties*, determined in good faith and not unreasonably disproportionate to any stated estimate.

> However, the inability to determine with reasonable certainty from the language used by the parties the quantity of goods to be sold may be regarded by the jury as an indication that the parties did not intend to form a legally-binding contract.

(Emphasis added.) Houston contends that this jury instruction was erroneous because: (1) the January 17, 1995 letter is devoid of language that might be construed to create a requirements contract; and (2) the court failed to instruct the jury that exclusivity is a prerequisite to a valid requirements contract. We disagree.

■ Because a requirements contract depends on exclusivity to determine the quantity, there can be no valid requirements contract without it. *See* WHITE & SUMMERS, *supra* § 3-9, at 156. However, "[d]espite the presence of another supplier, the contract may be sufficiently 'exclusive.' This may occur where a purchaser agrees to purchase exclusively from a seller up to a certain quantity." *Id.* In this case, the predominating issue was whether Houston's promise to purchase a "major share" or "major portion" of its requirements provided the jury with a reasonably certain basis for giving an appropriate remedy. Because the January 17, 1995 letter contains language from which a jury could have determined that Houston agreed to purchase exclusively from PMC up to a certain quantity, the superior court did not err in instructing the jury on requirements contracts.

Furthermore, although the superior court did not expressly state that a requirements contract must be exclusive to be valid, the requirement of exclusivity is implicit in the instruction. The court's instruction specifically indicated that the jury could measure the quantity of the goods to be sold by "the actual requirements of the buyer, or such proportion thereof as was reasonably contemplated by the parties." (Emphasis added.) The court's use of the language "actual requirements" when juxtaposed against the use of "or such proportion thereof" reasonably informs the jury that the parties can specify all requirements or a specific portion of the buyer's requirements. When taken as a whole, this instruction fairly presented the law to the jury and was, therefore, not erroneous. *Peterson v. Gray*, 137 N.H. 374, 377 (1993) (explaining that "the test of adequacy of any charge is whether, taken as a whole, it fairly presented the case to the jury in such a manner that no injustice was done to the legal rights of the litigants").

Houston also argues that the jury's finding on the issue of contract formation was clearly against the weight of evidence. The superior court has limited discretion in deciding whether to grant a motion for a judgment notwithstanding the verdict. *See Slattery v. Norwood Realty*, 145 N.H. 447, 448 (2000). A jury's verdict may only be set aside if it is "conclusively against the weight of the evidence or if it is the result of mistake, partiality, or corruption." *Quinn Bros. v. Whitehouse*, 144 N.H. 186, 190 (1999) (quotations omitted). "Conclusively against the weight of the evidence should be interpreted to mean that the verdict was one no reasonable jury could return." *Broderick v. Watts*, 136 N.H. 153, 162 (1992) (quotations and brackets omitted). In denying the motion for judgment notwithstanding the verdict, the superior court held that "[w]hile there certainly was evidence from which the jury could have found that the parties did not intend to enter into a binding contractual relationship,

there also was ample evidence ... from which the jury could have found that the parties did intend to form a binding contract." We agree.

■ Under the Uniform Commercial Code, "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." RSA 382-A:2-204(1). The record before us contains sufficient evidence for a jury to determine that the parties intended to enter into a binding agreement. During the trial, several witnesses testified regarding the January 17, 1995 letter and whether it was intended to create a binding commitment. Although there was testimony that the letter was not intended by Houston to create a commitment to purchase a certain amount of its thermocouple products from PMC, there was also substantial testimony that the January 17, 1995 letter was an acknowledgment of PMC's and Houston's intent to enter into a binding agreement in which PMC would be the primary source of thermocouple products for Houston. There was also testimony that the parties had agreed that PMC was to be Houston's preferred vendor of thermocouple products, and that Houston had committed to purchasing thermocouple products from PMC except in the rare circumstance that PMC could not meet an order. Because this evidence is sufficient for a jury to reasonably conclude that the parties intended to form a contract, the superior court did not err in denying the defendant's motion for judgment notwithstanding the verdict.

*Affirmed.*

BRODERICK, J., sat for oral argument but did not take part in the final vote; BROCK, C.J., and NADEAU and DALIANIS, JJ., concurred.