POULTRY PROCESSING, INC., Plaintiff,

and

The Pier Leasing Company, Inc., Party-in-Interest,

v.

OLD ORCHARD OCEAN PIER COMPANY, et al., Defendants.

Civ. No. 88–0126–P–C.

United States District Court, D. Maine.

Dec. 11, 1991.

Allen Hrycay, William Jordan, Portland, Me., for Poultry Processing, Inc.

Michael Kaplan, Preti, Flaherty, Beliveau & Pachios, Portland, Me., Ronald Caron, Caron & Sullivan, Biddeford, Me., Zbigniew Kurlanski, Portland, Me., for Old Orchard Ocean Pier Co.

Stephen Hessert, Portland, Me., for Roderick Rovzar.

Mark O'Brien, SBA, Augusta, Me., for Small Business Admin.

Philip Kilmister, Asst. Atty. Gen., Augusta, Me., for Maine Employment Securities.

Matthew Goldfarb, Portland, Me., for Coca–Cola Bottling.

Michael Feldman, Golver & Feldman, Brunswick, Me., for Nancy Sales Co.

David Ordway, Biddeford, Me., for Robert Lopreste, Charlene Lopreste.

Gregory Woodworth, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for Pier Leasing Co.

## OPINION

GENE CARTER, Chief Judge.

This case arose out of the foreclosure sale of the Old Orchard Beach Pier (hereinafter "Pier"), ordered by the Court in an Opinion and Order dated March 17, 1989. The Court found that Defendants Old Orchard Ocean Pier Company, *et al.* (hereinafter "OOOPCo") and Catherine Duffy Pet-

it (hereinafter "CP") had breached the conditions of the mortgage and security agreements held by Poultry Processing, Inc. (hereinafter "PPI"). The Court entered a Summary Judgment of Foreclosure and Sale on April 4, 1989. OOOPCo had a ninety-day redemption period following the Court's entering of summary judgment but it did not redeem the property. Accordingly, a public foreclosure auction was held on September 12, 1989 to sell the Pier, at which the mortgagee of the Pier, PPI, purchased the Pier as high bidder for $850,000.

PPI filed its first Report of Sale and Request for Entry of Deficiency Judgment on August 29, 1990. Defendants filed an Objection to Report of Sale and Complaint of Law and in Equity on September 28, 1990.[1] The Court on November 30, 1990, sustained Defendants' Objection to Plaintiff's Report of Sale and ordered Plaintiff to file a new Report of Sale. Plaintiff responded to the Court's Order by submitting an Affidavit of Counsel and Response of Plaintiff to Objection to Report of Sale and Complaint of Law and in Equity on December 27, 1990.

Defendants filed a Second Objection to Report of Sale on January 29, 1991. On March 19, 1991, the Court again sustained Defendant's Objection to Report of Sale and ordered Plaintiffs to file a new Report of Sale and request for deficiency judgment. The Court stated in its Order that the "filing should be sufficiently detailed and documented to generate the issue of the adequacy of sale and disbursement of the proceeds in a *full, complete,* and *comprehensible* manner. Failure to adequately document or explain the accounting shall constitute a waiver as to any disputed disbursement." *Id.* at 2 (emphasis added). On April 9, 1991, Plaintiff filed a Third Report of Sale, to which Defendants filed a Third Objection to Report of Sale on May 9, 1991.

A bench trial was held on September 19 and 20, 1991 on the disputed issues concerning Plaintiff's Report of Sale and on Defendants' Counterclaim. At the conclusion of Defendants' case, the Pier Leasing Co., Inc. (hereinafter "PLC"), and then PPI and the Small Business Administration (hereinafter "SBA"), made an oral motion,[2] which was heard on the record by the Court, for involuntary dismissal of the Counterclaim under Federal Rule of Civil Procedure 41(b).[3] The Court noted that it would take the motion under advisement and that it would hear argument thereon in written form. Trial Transcript 446–47 (hereinafter "Tr."). Following the conclusion of all of the evidence, PLC and PPI renewed their motion for involuntary dismissal. Tr. 487.[4]

## I. INVOLUNTARY DISMISSAL

Pursuant to Federal Rule of Civil

---

1. Plaintiff filed a Motion to Dismiss the Complaint on October 19, 1990. Defendants then filed a Motion for Leave to File Complaint in Law and Equity as Supplemental Counterclaim with Incorporated Memorandum of Law on November 21, 1990. The Court granted this motion on December 13, 1990.

   On April 1, 1991, Defendants filed a Supplemental Counterclaim (hereinafter "Counterclaim"), requesting that the foreclosure sale be set aside on the basis of fraud.

2. The SBA subsequently withdrew its motion because SBA, OOOPCo, and CP reached a settlement, thereby taking the SBA out of the case. Tr. 485–87; *see also* Stipulation to Liability of Catherine Duffy Petit and Old Orchard Ocean Pier Co. to United States Small Business Administration dated October 1, 1991.

3. Although the motion was characterized as one for directed verdict, the Court recognizes that the motion should and will be treated as a motion for involuntary dismissal pursuant to Rule 41(b) of the Federal Rules of Civil Procedure because it was made in the context of a nonjury trial. *Central Maine Power Co. v. Foster Wheeler Corp.,* 116 F.R.D. 339, 340 (D.Me.1987). *But see infra* note 5.

4. Defendants, as a counterclaimant, are Plaintiffs, as against Plaintiff PPI and Party–in–Interest PLC, within the purview of Rule 41(b). Similarly, Plaintiffs are Defendants. In any event, labels are relatively unimportant. The provisions of Rule 41(b) apply equally "to the dismissal of any counterclaim, cross-claim, or third-party claim." For the sake of clarity, the Court will continue to define the parties based upon the original posture of the case. Hence, PPI is Plaintiff, OOOPCo and CP are Defendants, and PLC is Party–in–Interest.

Procedure 52(c):[5]

> If during a trial without a jury a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party on any claim, counterclaim, cross-claim or third-party claim that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

Motions under Rule 41(b), the precursor to Rule 52(c), have not been favored in this circuit and dismissal under this rule should be granted "sparingly." *Central Maine Power Co.*, 116 F.R.D. at 341 (quoting *D.P. Apparel Corp. v. Roadway Express, Inc.*, 736 F.2d 1, 3 (1st Cir.1984)). The First Circuit has noted that:

> Except in *unusually clear* cases the district judge can and should carry the defendant's Rule 41(b) motion with the case—or simply deny it, since the effect will be the same—let the defendant put on his evidence, and then enter a final judgment at the close of the evidence.

*D.P. Apparel Corp.*, 736 F.2d at 3 (quoting *Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784, 793 n. 19 (5th Cir.1975)) (emphasis added). In the First Circuit, a 41(b) motion will not be granted unless "it is manifestly clear that plaintiff will not prove his case." *Central Maine Power Co.*, 116 F.R.D. at 341 (quoting *D.P. Apparel Corp.*, 736 F.2d at 3).

After having carefully reviewed all of the evidence, both testimonial and documentary, admitted during Defendants' case, the Court cannot conclude on the record made by Plaintiff's case-in-chief that it is "manifestly clear" that Defendants will not recover under their Counterclaim for fraud. Therefore, the Court will dismiss PLC's and PPI's motion for involuntary dismissal.

All of the evidence having now been heard and extensively briefed, the Court will herein exercise its discretionary authority to weigh and evaluate the evidence and render findings of fact for purposes of resolving issues generated by the third Report of Sale and Defendants' Counterclaim. The Court will render these findings of fact as it discusses the applicable law.

## II. DISCUSSION

The parties dispute who has the burden of proof in this case. Both PLC and PPI argue that, because Defendants have alleged fraud, they must prove the alleged fraudulent conduct by clear and convincing evidence. *See* Post–Trial Brief of Party-in-Interest Pier Leasing Co., Inc. at 5 (hereinafter "PLC's Post–Trial Brief"); Post–Trial Brief of Plaintiff Poultry Processing, Inc. at 7 (hereinafter "PPI's Post–Trial Brief"). Defendants argue that PPI bears the burden of proof at all times and must demonstrate by a preponderance of the evidence that it has complied with Maine Revised Statutes Annotated, Title 14, section 6324, and the Court's Order. Defendants' Post–Trial Brief at 4.[6]

For the reasons that follow, the Court concludes that Defendants bear the burden

---

**5.** Rule 52(c) replaced Rule 41(b), as of December 1, 1991. The Court applies Rule 52(c) because the Court renders its judgment after that date. The pertinent language of Rule 41(b) is cited here, however, because the Court relies upon case law that has applied that rule. Under Rule 41(b), a party:

> [M]ay move for a dismissal on the ground that upon the facts and the law, the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all of the evidence.

**6.** Defendants add, however, that they must first make a *prima facie* showing of PPI's failure to comply with the statute and the Court's Order before the burden of proof shifts to PPI:

> Defendant's [sic] legal argument need only ... make a prima facie showing that the Plaintiff was not the "highest bidder" under the law and the auction was not a "public sale" under the law. The burden should then shift to Poultry Processing to prove by a preponderance of the evidence that it complied with the terms of the statute.

Trial Brief of Defendants Old Orchard Ocean Pier Co. and Catherine Duffy Petit Pursuant to Court's May 2, 1991 Order at 7–8 (hereinafter "Defendants' Trial Brief").

of proving the alleged fraudulent conduct of PPI and PLC by clear and convincing evidence.

The parties dispute whether, as part of the alleged fraud committed by PPI and PLC, "PLC entered into an agreement with PPI prior to the foreclosure sale pursuant to which PLC purportedly agreed to purchase the Pier from PPI after the foreclosure sale." Trial Brief of Party-in-Interest The Pier Leasing Co., Inc. at 3 (hereinafter "PLC's Trial Brief"). According to Defendants, "[p]rincipals of both PPI and PLC made statements consistent with the existence of a preagreement to sell the Pier to PLC during the spring and summer of 1989 prior to the auction." Defendants' Proposed Findings of Fact, ¶ 10(iv) (hereinafter "Defendants' Facts"). According to PLC, "[n]o discussions regarding a sale of the pier by Poultry Processing to Pier Leasing occurred between Poultry Processing, its representatives and agents, and Pier Leasing, its representatives and agents, prior to the date of the foreclosure sale." PLC's Proposed Findings of Facts, ¶ 41 (hereinafter "PLC's Facts").[7] PLC further noted that "[p]rior to the date of the foreclosure sale, no agreement had been entered into by and between (a) Bernard Lewis, David Lewis or Poultry Processing and (b) Nat Golzbein, Paul Golzbein or Pier Leasing, relating to a sale of the pier." *Id.*, ¶ 42.

Maine law has set forth the elements that must be proved to sustain a fraud claim:

[A] defendant is liable for fraud or deceit if he (1) makes a false representation (2)

of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage.

*Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me.1987) (quoting *Letellier v. Small*, 400 A.2d 371, 376 (Me.1979) (footnote omitted)); *see also Butler v. Poulin*, 500 A.2d 257, 260 (Me.1985); *McKinnon v. Tibbetts*, 440 A.2d 1028, 1030 (Me.1982); *Emerson v. Ham*, 411 A.2d 687, 689 (Me.1980). In addition, the plaintiff in an action for fraud "must prove every element of his claim by clear and convincing evidence, that is, evidence that establishes every factual element to be highly probable." *Butler*, 500 A.2d at 260 n. 5; *see also Wildes v. Ocean National Bank*, 498 A.2d 601, 602 (Me. 1985); *Taylor v. Commissioner of Mental Health and Mental Retardation*, 481 A.2d 139, 153 (Me.1984).[8] The Maine Law Court has characterized a plaintiff's burden as "heavy" in this regard. *Wildes*, 498 A.2d at 602.

Under Maine law, PPI's and PLC's position that Defendant bears the burden of proof in alleging fraud is fully supported in that cases have set out the aforementioned elements of fraud *or* deceit and applied the "clear and convincing" standard of proof to both fraud and deceit actions. *See, e.g., Jourdain*, 527 A.2d at 1307 ("[A] defendant is liable for fraud or deceit if ..."); *Butler*, 500 A.2d at 260 ("[T]he plaintiff in an action for fraud must prove every ele-

---

**7.** The Court notes that this paragraph has been misnumbered and should read "41," not "39." Similarly, the following paragraph should read "42," not "40."

**8.** Defendants deny that they must establish fraud by clear and convincing evidence. *See* Defendants' Post–Trial Brief at 2–3. They cite two cases to argue that "the clear and convincing evidence standard may not apply to *all* cases where fraud is alleged generally, as opposed to fraudulent misrepresentation." *Id.* at 2 n. 1 (citing *Forbes v. Wells Beach Casino, Inc.*, 409 A.2d 646, 656 (Me.1979); *Albee v. Laroux*, 122 Me. 273, 275, 119 A. 626 (1923)).

The Court finds that this supposed distinction between fraud and deceit or fraudulent misrep-

resentation has no bearing on the instant case. First, neither *Forbes* nor *Albee* holds that the standard of clear and convincing evidence does not apply in fraud cases. Second, Defendants' claims do entail fraudulent misrepresentation. That is, Defendants allege that Plaintiffs misrepresented Pier income and misrepresented an alleged pre-auction agreement between PLC and themselves. In short, Maine case law cited by Defendants does not stand for the proposition claimed by Defendants, but, even if the case law held that a lesser standard of proof applied to "general fraud," that conclusion would have no bearing on the allegations in this case.

ment of his claim by clear and convincing evidence ..."); *Wildes*, 498 A.2d at 602 (same); *McKinnon*, 440 A.2d at 1030 ("[A] defendant is liable for fraud or deceit if ..."); *Emerson*, 411 A.2d at 689 ("In order to prevail in an action for fraud or deceit the plaintiff must prove ..."). The Court rejects Defendants' attempts to recharacterize its burden of proof on its Counterclaim.

■ Where fraud is alleged in the context of an action to set aside a foreclosure sale, the law is clear that the burden of proof is on the party contesting the sale. *See, e.g., Federal Deposit Insurance Corp. v. Dye*, 642 F.2d 837, 842 (5th Cir.1981) ("[T]he burden is on the one attacking the sale to rebut the prima facie showing by proving that the price was 'grossly inadequate and the sale ... [was] accompanied by ... fraud ... which might authorize a finding that such circumstances contributed to bringing about the inadequacy of price.'") (quoting *Giordano v. Stubbs*, 228 Ga. 75, 79, 184 S.E.2d 165 (1971)); *United States v. Von Cseh*, 354 F.Supp. 315, 318 (S.D.Tex.1972) ("The burden is on the complaining party to establish invalidity. For the sale to be void the complainant must show either a fraud which deceived the complainant or 'both irregularity calculated to affect the sale and a gross inadequacy of price.'"); *East Jersey Savings & Loan Association v. Shatto*, 544 A.2d 899, 901 (N.J.1987) ("In order to set aside a judicial sale there must be a showing of fraud, accident, surprise or mistake, irregularities in the sale and the like. The burden of proof rests with the objector.") (citations omitted); *Bachrach v. Washington United Co-op., Inc.*, 181 Md. 315, 29 A.2d 822 (1943) ("[T]he party seeking to have a sale vacated on the ground of fraud has the burden of proof.").[9] Hence, in this case,

Defendants bear the burden of proof as they allege fraud as a basis for contesting the foreclosure sale. For the reasons that follow, the Court concludes that Defendants have failed to meet their burden of providing clear and convincing evidence of fraud.

### A. *Pre–Auction Discussions*

■ PPI took possession of the Pier in late March of 1989 after the Court had ruled on March 17, 1989 that Defendants were in default under the terms of its mortgage with PPI. On April 21, 1989, PPI and PLC entered into a lease agreement commencing April 15, 1989 and concluding April 14, 1990, pursuant to which PLC leased the Pier from PPI in the amount of $95,000. PLC's Facts, ¶ 1. PLC was also required to pay real estate taxes, insurance, maintenance and repairs. *Id.; see also* Tr. 126. On the same date, Nat Golzbein, the President of PLC, and Paul Golzbein, the treasurer of PLC, personally guaranteed the obligations of the lease. PLC's Facts, ¶ 2. During the months of May and June of 1989, PLC entered into fifteen subleases with individuals and entities pursuant to which PLC subleased space on the Pier to these individuals and entities in return for lease payments. PLC also entered into oral agreements with several sublessees pursuant to which the sublessees rented space on the Pier during the summer of 1989. *Id.*, ¶ 4.

According to Defendants' witness, Jerome Plante, Bernard Lewis[10] told him in March or April of 1989 that Nat Golzbein was going to purchase the Pier that fall. Tr. 18–19. He added that "after the summer the person who was leasing the pier would purchase the pier and would pay those personal taxes." Tr. 21.[11] Plante

---

**9.** The Court concurs with PLC's assessment that "... the Maine Law Court appears not to have addressed the burden of proof issue in the context of an action seeking to overturn a foreclosure sale." PLC's Post–Trial Brief at 5. The Court is fully satisfied that when the Law Court does face resolution of this issue, it will follow the rule of the authorities cited in the text.

**10.** Bernard Lewis was the chief operating officer of PPI until his death in late May 1989.

PLC's Facts, ¶ 7. His brother, David Lewis, succeeded him as PPI's chief operating officer. He was Bernard's nearly constant companion during the year prior to his death and was actively involved in PPI's business during this year. *Id.*

**11.** In a subsequent letter dated May 8, 1989, however, in which Bernard Lewis set forth the substance of the conversation that he had with Plante, Lewis makes no mention of any agree-

then stated that David Lewis later told him, in April or May of 1989, that Nat Golzbein would lease the Pier in the summer of 1989 and he would purchase the Pier. Tr. 34. Plante admitted later, however, that he never told Golzbein that he was aware of any agreement to purchase the Pier between Golzbein and PPI. Tr. 36. Later, when questioned by the Court, Plante stated that both Lewises "led [him] to believe" that Golzbein was going to buy the Pier. Tr. 37. When pressed further by the Court, Plante responded "I don't recall sir" when asked whether David Lewis ever told him that Golzbein was going to buy the Pier. Id.

Nat Golzbein denied having any discussions with Bernard Lewis prior to the auction of the Pier regarding purchasing the Pier from him or his company. Tr. 351. He also noted that he never had any agreement with Plante to pay back the personal property taxes owed by CP on the Pier. He never paid those taxes nor was he ever approached by Plante to do so. Tr. 359. Similarly, David Lewis testified that he never said anything to Plante to the effect that either he or PPI had made an agreement to sell the Pier to Nat Golzbein or to his company. Tr. 447.

Based on Plante's wavering testimony and the contradictory testimony of two other witnesses, and the Court's assessment of the credibility of these witnesses, the Court rejects Plante's recollections that he was told, prior to the foreclosure sale, of an actual agreement between Golzbein and PPI for purchase of the Pier.

Defendants' witness, Robert Winslow, an employee of Bill's Light Trucking who removed rubbish from the Pier during the summer of 1989, testified that he overheard an argument between Nat Golzbein and a Pier tenant during July of 1989. Tr. 89–91. He stated that he heard Golzbein tell "the other guy to cooperate with him that he was going to own the pier next

year, the following year." Tr. 91. The Court finds that this conversation is not proof of a pre-existing agreement between PPI and PLC regarding purchase of the Pier. Golzbein's statement is sufficiently ambiguous to be susceptible to several different interpretations, any one of which is more likely an accurate explanation of the facts.

Defendants' witness, Sherry Girard, testified to three meetings that she witnessed or attended. She testified that at the first meeting, held approximately March 12, 1989, which she overheard from an adjoining office, Nat and Paul Golzbein stated to CP that they had a deal with Bernard Lewis, that they were going to buy the Pier, and that it "was better that they have the pier than anyone else since they've been there so many years ..." Tr. 44.[12] Her notes from the first meeting that seem most suggestive of a possible "deal" between PPI and PLC, include the following: "Bernie Lewis will talk to anyone with money," and "[i]f Nat buys pier from Bernie Lewis ..." Tr. 58–60. The Court does not find any clear indication in these notes that Nat Golzbein had a complete and enforceable pre-auction agreement with PPI to purchase the Pier.

Ms. Girard also testified to a second meeting held on March 19, 1989, which was attended by CP, Paul Golzbein, Nat Golzbein, Skip Church, and, for a portion of the meeting, herself. Tr. 421. She testified that "[Nat Golzbein] was telling [CP], and Paul was going along with this, that he had a deal with Bernie to buy the pier, he said this again, and, it was inevitable that he was going to own the pier." Tr. 47. Her notes of that meeting state that "Nat said Bernie offered to sell him pier. If he buys pier, CDP can buy from him cheaper ... he will definitely sell that to her." Tr. 67. Similar to her notes from the previous meeting, Ms. Girard's notes are stated con-

ment between Nat Golzbein and himself for Golzbein to purchase the Pier. Tr. 29–30, 34–35.

**12.** Ms. Girard took notes regarding the first two of these three meetings. She recorded the first meeting's notes on a legal pad at the OOOPCo

offices while the conversation was taking place. Tr. 58. She recorded the second meeting's notes on an envelope in CP's car after the meeting. Tr. 66. These notes were entered into evidence. Exhibit 80 (hereinafter "Ex.").

ditionally, (*i.e.,* "if he buys pier,") not absolutely.

Lastly, Ms. Girard testified to a third meeting in which CP, Nat Golzbein, and she were present. She testified that Golzbein stated to CP, "I've heard rumors from people that you are out to crucify me and I'm upset about it, I don't know what the problem is, I thought we had a deal." Tr. 49.

With respect to these meetings, CP later testified that "[Nat Golzbein] told [her] that Bernard Lewis had made clear to him that he would in fact be willing to sell him the Pier, and that Nat would buy the Pier with my blessing, that it would be in my best interest." Tr. 414. She also testified that Golzbein had told her that "he had been assured by Bernard Lewis that if he in fact leased the Pier for the '89 season, that they would see to it that he was able to purchase the Pier." Tr. 415–16. CP stated that Nat Golzbein wanted her to know that he was buying the Pier to hold for her until she could buy it back. When asked whether he said that he had had any discussions or confirmations from anyone representing PPI, she stated that he told her he was in constant touch with them, adding that she knew this because she had seen them, at least Paul Golzbein and Bernard Lewis, together at J.R. Flanagan's. Tr. 423.[13]

Nat Golzbein later testified that he never had any discussions with Bernie Lewis prior to the auction of the Pier regarding purchasing the Pier from him or his company. Tr. 351. He also denied making any statements to CP regarding either any agreement on his part to buy the Pier from PPI or that he would sell the Pier back to her. Tr. 479. The Court finds his testimony on these points to be fully credible.

Similarly, David Lewis denied that he ever had any contact with the Golzbeins regarding disposition of the Pier prior to or during the lease negotiations. Tr. 255; 309–10. Lewis also testified that his brother Bernie had never informed him that he either had discussions with the Golzbeins or anyone affiliated with PLC regarding the possible purchase of the Pier or that he had entered into an agreement with Nat Golzbein or PLC to buy the Pier. Tr. 255, 307–08. He noted that if an agreement were entered into prior to his brother's death, that agreement could not have been implemented without his knowledge or approval. Tr. 309–10. The Court believes this testimony.

Paul Golzbein also denied having any discussions with either Bernard or David Lewis or any representative of PPI regarding PLC's purchase of the Pier. Tr. 467. Though he acknowledged that he had lunch with Bernard Lewis, Paul Golzbein stated that they talked only about PLC leasing, not purchasing, the Pier. Tr. 467–68.

In assessing Ms. Girard's credibility, the Court notes that she is currently and exclusively employed by Defendant CP, a fact that Ms. Girard was seemingly reluctant to disclose at trial. Tr. 51–52. The Court found her to be evasive on this point. *Id.* She also admitted that OOOPCo has been her primary source of income during the last ten years. Tr. 55. Ms. Girard also admits that she has known CP "for many many years," and that they "have been friends for a long time." Tr. 40.

Although neither Ms. Girard's personal nor vocational relationship with CP in itself fatally undermines her credibility as a witness, the Court notes the significance of her clear evasiveness to questions pertaining to her current employment with CP and her long-term economic dependence upon CP. It also notes the contradictory testi-

13. CP later contradicted this latter testimony:
[Under cross-examination by Mr. Hrycay]:
Q When did people see Bernard Lewis and Paul Golzbein at J.R. Flanagan's?
A Paul Golzbein and Bernard Lewis were seen at J.R. Flanagan's between January and March of 1989.
Q On how many occasions?
A I cannot tell you the total, I am aware of two and, again, it could have been David Lewis.
THE COURT: Did you see them or [is that] something you have been told?
A I have been told. I saw Paul Golzbein with a man back to and I was told it was Bernie Lewis, once.
Tr. 427.

mony of Nat Golzbein, Paul Golzbein, and David Lewis regarding statements that PLC planned to purchase the Pier from Bernard Lewis. As a result, the Court disbelieves Ms. Girard's testimony regarding purported statements made by the Golzbeins at the meetings in question. Moreover, as noted earlier, her notes do not reflect explicit statements from Nat Golzbein that he had a pre-auction agreement with PPI to purchase the Pier.

In assessing CP's testimony, the Court questions her credibility for several reasons. First, when questioned about her reasons for signing a $400,000 promissory note at the meeting on March 19, 1989, she simply stated that she had introduced the Golzbeins to the person who purchased the property that was the subject of the note and that she felt responsible. Tr. 422. On cross-examination, however, CP revealed that her involvement with the property was more than a simple introduction. Initially, she stated that she did not own the property and "would not have benefitted." Tr. 433. A moment later, however, she admitted that she "eventually would have benefitted from that transaction had the property been developed the way it was planned by use [as][ ] a commercial space." Tr. 434.[14]

Second, CP's credibility was also put into question when she denied that she was the treasurer of Willow Development Corporation even though Exhibit 124, a promissory note to New England Mortgage Services, contains her signature in her capacity as treasurer of that corporation. Tr. 435. Despite her admitted signature, she denied that she was the treasurer of the corporation. Id.[15] Lastly, as mentioned previously, CP contradicted herself on whether she actually saw Paul Golzbein and Bernie Lewis together at a restaurant or whether someone told her that they had been seen together. Tr. 427.

In light of the inconsistencies and contradictions in her testimony, the Court questions the accuracy of her recollections regarding actual statements made by the Golzbeins about their "deal" to purchase the Pier from PPI. The Court is not persuaded of Defendant CP's credibility on the question regarding the purported communications between the Golzbeins and herself and, therefore, accords little weight to her testimony on these points.

In sum, the Court does not find the testimony of Jerome Plante, Robert Winslow, Sherry Girard, and CP to provide clear and convincing evidence of a pre-auction agreement between PPI and PLC.[16]

Defendants raised other pre-auction circumstantial evidence of a pre-auction agreement. First, they note the absence of owner financing for the Pier. See Defendants' Post–Trial Brief at 8. Their witness, Joseph Murphy, testified that owner financing would have clearly enhanced the prospects of a sale. Tr. 114–16. Defendants find significant that PPI offered such financing for PLC in December of 1989 but

---

**14.** The "obligation" to which CP alluded in her direct testimony turned out to be more complicated than she initially admitted:

[Cross examination by Mr. Woodworth]
Q What I'm asking, Mrs. Petit, is if the $400,000 note to Nat Golzbein that was secured by a second mortgage on the Four Flags Hotel was wiped out by the foreclosure of the hotel by New England Mortgage Services?
A I believe it was by Willow.
Q And that's why Mr. Golzbein approached you and asked you to sign a $400,000 note?
A That was one of the reasons; yes.
Tr. 438–39.

**15.** Her testimony in part includes the following:
[By Mr. Woodworth]
A ... I was not a part of Willow Development Corporation.

Q Notwithstanding the fact that you signed this document as treasurer of Willow Development Corporation, your testimony here today is that you were not a part of that development company?
A I was not part of that company.
BY THE COURT: Could you explain to me why you were going around signing a $500,000 note as treasurer of the corporation?
A I was asked to guarantee the note and I did.
Why?
A I cannot tell you your Honor, and I never was treasurer of Willow Development.
Tr. 436.

**16.** The Court notes that, even if the standard of proof were preponderance of the evidence, the testimony of these witnesses would fall short of meeting even that lesser standard.

not at the foreclosure auction in September of 1989. *See* Defendants' Post–Trial Brief at 8. Similarly, Defendants argue that "Nat Golzbein's explanations of his behavior prior to the sale, and his preparations for bidding at the auction are, if true, completely irrational." *Id.* at 8. First, they do not find it credible that Golzbein did not discuss putting together a financial package until a month to a month and one-half prior to the auction. *See id.* at 12–13; Tr. 333, 367–68. Next, they claim that his bid of $600,000 was "wholly inadequate for anyone who was at all familiar with the Pier's income stream." Defendants' Post–Trial Brief at 12–13. Further, they assert that, in connection with his failure to seek financing from a bank prior to the foreclosure auction, his statement that "no bank would loan on the Pier was completely untrue." *Id.* at 12. They also question why Golzbein did not approach PPI for financing. *Id.* Lastly, they note that Golzbein sold his gift shop, Woolf & Co., before the Pier sale to him was finalized. *Id.* at 13. Based on what Defendants construe as Golzbein's "irrational," "untrue," "not credible," and "remarkable" conduct surrounding the foreclosure auction and subsequent purchase of the Pier, they conclude that this conduct provides further circumstantial evidence of a pre-auction agreement.[17]

The Court finds that Defendants' "evidence" is mere second-guessing on their part about Golzbein's business decisions. The Court will not pass judgment on the soundness of these decisions, but it does find that they do not represent persuasive circumstantial evidence of fraud.

**B.** *Pre–Auction Preparations*

After Defendants' ninety-day redemption period expired in July of 1989, PPI interviewed auctioneers and ultimately hired Richard W. Oliver, Inc. (hereinafter "Oliver") to conduct the foreclosure sale of the Pier. Oliver, through its auctioneer/broker Joseph Murphy, and PPI, through its President David Lewis, executed on July 21, 1989, an agreement for the exclusive right to sell the Pier at auction. Ex. 1.

### 1. Pier Income

The parties dispute the accuracy of the amount of Pier income identified in the buyer's prospectus. Defendants allege that PPI "misreported to the auctioneer the level of gross income which could be anticipated by the owner or operator in control of the Pier, informing him only of the amount embodied by the written leases, and failing to inform him about other income known to PPI, PLC and their agents." Defendants' Post–Trial Brief at 7. Plaintiff PPI argues that "Defendants did not produce a single witness at trial to testify that the total lease income was $300,000 or that PPI knew or had reason to know prior to the auction that the total lease income for 1989 was anything other than $193,500." PPI's Post–Trial Brief at 13. PLC argues that, even assuming that Pier income was underreported, "OOOPCo and Petit adduced no evidence indicating any involvement of Pier Leasing in the reporting of income to the auctioneer." PLC's Post–Trial Brief at 3. The Court finds the following facts regarding the alleged misrepresentation of lease income.

Murphy requested David Lewis to furnish "documented income that the pier could produce." Tr. 102. In response to this request, PPI, through its attorney Allen Hrycay, provided the auctioneer with a copy of the Lease to PLC, Exhibit 71, as well as copies of fifteen subleases that PLC had entered into for the 1989 season and that were furnished to PPI by PLC. Exs. 70-4—70-18.[18] The auctioneer prepared a buyer's prospectus, Exhibit 2, in early Au-

---

17. As further circumstantial evidence of an alleged pre-auction agreement, Defendants presented testimony regarding the alleged deterioration of the Pier during the summer of 1989. William Nason, Tr. 77–83, and Robert Winslow, Tr. 87–89, testified to the appearance and condition of the Pier. The Court does not find these witnesses' testimony to be persuasive circumstantial evidence of any pre-auction agreement.

18. Attorney Hrycay was unaware of the oral leases of the summer of 1989, totalling $43,500 in income, and hence could not provide that additional information to the auctioneer. Tr. 408. He learned of these oral leases during the bench trial. *Id.*

gust of 1989[19] and added up the rents in the fifteen subleases to $193,500. Tr. 101, 102. He included that sum in the buyer's prospectus as "total lease income." Tr. 102, 123. The last page of the prospectus provided a summary of the subleases and expressly noted that "this listing may not be complete." Tr. 138; PLC's Facts, ¶ 14. This statement was added to the list because Murphy was not sure if some leases were missing. Tr. 138. He could not remember whether he showed the list to PLC in an attempt to determine whether the list was complete. Id. The prospectus also advised any prospective bidders to make their own independent investigation. Tr. 124. Murphy sent copies of the buyer's prospectus to David Lewis and Allen Hrycay, neither of whom contacted him to indicate any dissatisfaction or problem with it. Tr. 103–04.

On cross-examination, Murphy admitted that he would be misleading any potential bidder at the sale if the prospectus indicated that the total lease income was $300,000 when it was only $193,500. Tr. 103–04.[20] Murphy conceded that the rental income derived from the subleases was not actually relevant to the auction because the auction was not the sale of businesses but rather real property in the form of rental spaces available on the Pier and personal property located on the Pier. Tr. 129–30.[21]

The Court finds this testimony persuasive in establishing that the disputed additional income figure derived from the subtenants' income was not essential for the purposes of the auction. Moreover, Murphy's testimony fails to establish that he, in fact, requested such information from PPI, which, in turn, casts serious doubt on its importance. The buyer's prospectus clearly states "Total lease income for 1989—$193,500" under "Income." Ex. 2. The Court is satisfied that PPI complied with the auctioneer's request for the income that the Pier could produce when it provided him with the leases in question.[22]

**19.** The buyer's prospectus advised bidders that the seller and auctioneer were not making any warranties as to the accuracy and completeness of the information set forth in the prospectus and advised bidders to make such investigation as they deemed appropriate. Ex. 2.

**20.** With respect to lease income noted in the prospectus, Murphy testified to the following on cross-examination:

[By Mr. Hrycay]

Q When did you mail out that prpospectus [sic]?
A We started mailing it out as soon as it was compiled and I guess that was about two weeks after we signed the contract.
THE COURT: Approximately when would that be?
A That would be—.
July?
A No, I would say we would have started sending it out probably the second week in August.
Q That would be the second week in August. At that point in time the season on the pier in relation to any income figure or expense figure and operations on the pier would not even be finalized; is that correct, at the time you mailed out the prospectus?
A The leases were signed the beginning of the summer, I believe, so the agreements were already struck by that date.
Q The only information you needed for the prospectus was the lease income.
A I needed any income, lease income certainly.

Q What other income would there be that should be included?
A Lease income was fine, if that is all you had.
Tr. 124–25.

**21.** In follow-up cross-examination by Attorney Woodworth, Murphy was asked:
Q If you were not selling the business then are all of those matters that Mr. Hrycay asked you, important to be included in the prospectus?
A If we were not selling a business?
Q That's correct, would it be important for you to have the income that each of those little shops made?
A I would say no.
Tr. 130.

**22.** In this regard, the Court engaged in the following colloquy with Murphy:
Q So the income, if you sold the pier as real estate to an owner[ ] ... [who] was going to follow the past historical practice of operating the pier[;] [t]he income that owner could look forward to would be the income from the leases?
A That's correct.
Q Unless that owner was going to actually operate a restaurant or shop or some kind of business on the pier and in which you might have additional income that would come from that shop or business?
A That is correct.
Q And to the extent that the business interest of Poultry Processing was [a] real estate interest in the ownership of the pier?

With the exception of the $43,500 income derived from the oral leases, the figure of $193,500 correctly reflects the total *lease* income generated from the leases provided by PPI.[23]

## 2. Personal Property

The parties dispute the role of the personal property of the Pier in both the foreclosure auction and the appraisal report.[24]

Defendants allege that "PPI and its agents totally disregarded the substantial personal property that was on the Pier, abandoned any kind of reasonable commercial behavior." Defendants' Post-Trial Brief at 8. They also assert that "[t]he appraisal, however, by its own words, did not purport to appraise fair market [sic] the value of personal property that was sold with the Pier." *Id.* at 19. Accordingly, they conclude that "[s]ince the appraisal does not even purport to establish the fair market value of the property that was auctioned but only a component of it, PPI has

> A That's correct.
> Q What would be relevant [in] terms of determining the income stream that could be generated by the pier as real estate, would be the leasing?
> A That's correct.
> Tr. 147.

**23.** Defendants argued that Attorney Hrycay deliberately withheld income information that resulted in understating the lease income generated by the Pier. Approximately three weeks prior to the auction, Attorney Hrycay met with Dana Relyea of the SBA and Paul Golzbein at the Pier on August 24, 1989. Tr. 378; PLC's Facts, ¶ 16. During the course of that meeting, Paul Golzbein stated that the income generated by the Pier during the summer of 1989 might be closer to $300,000 than $200,000. Attorney Hrycay did not communicate this information from Paul Golzbein to either Murphy or Oliver. Tr. 378.

In response to Attorney Hrycay's admission that he failed to communicate this additional information regarding income to the auctioneer, Attorney Kaplan asked Mr. Hrycay during his testimony:
> Q Wasn't it your client's purpose to maximize the return from this sale if at all possible?
> A Yes.
> Q And isn't it likely that having more accurate, especially higher figures foreclose [sic] income from the Pier might help to attract more bidders?
> A Yes.
> Tr. 378–79.

not fulfilled the statutory requirements and is not entitled to *any* deficiency at all." *Id.* at 20.[25]

Plaintiffs argue that the relevant Maine statute, 14 M.R.S.A. § 6324, "applies only to real estate and does not apply to personal property." Reply Brief of Plaintiff Poultry Processing, Inc. at 5.[26]

PLC characterizes as a misstatement Defendants' claim that PPI disregarded the substantial personal property on the Pier. They assert that "[t]he only evidence of the value of the personal property on the pier at the time of the auction was that set forth by Allen Hrycay and Paul Golzbein. They testified that the value of the property was between $10,000 and $25,000." Reply Brief of the Party–in–Interest The Pier Leasing Co., Inc. at 8. The Court finds the following facts pertaining to the issue of the Pier's personal property, both in terms of the foreclosure auction and appraisal report.

> Although the Court acknowledges that this failure by Attorney Hrycay to disclose the additional income information to the auctioneer is noteworthy, it does not find that such failure is reflective of any pre-auction agreement between PPI and PLC. It seems more indicative of negligence than fraud.

**24.** The appraisal report, Exhibit 120, has been submitted to the Court as an attachment in the three Reports of Sale.

**25.** The Court will not address Defendants' allegations added in its amended Supplemental Counterclaim regarding the destruction or damage to substantial amounts of personal property belonging to Defendants. The Court denied the motion to amend the Supplemental Counterclaim on August 1, 1991. For the same reason, the Court will not address Defendants' allegations in the same Counterclaim that PPI and PLC "failed properly to maintain the Pier and keep it clean, rendering the Pier less attractive to prospective buyers and lowering its value." First Amended Supplemental Counterclaim, ¶ 20c, at 2. The Court has already rejected the testimony regarding the alleged deterioration of the Pier as circumstantial evidence of a pre-auction agreement.

**26.** The Court finds nothing in the language of the Maine statute that precludes the valuation of personal property as part of the report of the sale, especially where personal property, together with the realty, is going to be the subject of the foreclosure sale.

The Court finds that the foreclosure auction was for the sale of *both* real and personal property. The auctioneer, Joseph Murphy, testified that, in addition to the real estate of the Pier, he was selling the personal property on the Pier. Tr. 141. He noted that he was never able to provide a list of the Pier's personal property to prospective buyers because no one ever provided it to him. Tr. 105. As a result, the buyer's prospectus did not list personal property. Tr. 100; Ex. 2. Murphy stated that he was "sure" that he had made a request of a list of personal property. Tr. 100. For instance, he recalled meeting with Nat Golzbein on the Pier and asking about its personal property. Tr. 104–05. In response, Murphy recalled that Golzbein "said essentially the personal property was rather insignificant and of no value." Tr. 105. Under cross examination, Murphy reiterated that he had asked Nat Golzbein for a list of personal property and that Golzbein's response was that "basically it was not worth anything, there might be an oven and the oven doesn't work, and it's basically insignificant, minor items that really and truly have no value." Tr. 139. Golzbein denied that Murphy ever asked him for a list of the personal property. Tr. 355, 360.[27]

Murphy testified that he also had asked David Lewis and Attorney Hrycay for a list of personal property. *Id.* He stated that he probably asked David Lewis for the list during a telephone conversation. Tr. 127. On direct examination, David Lewis admitted that Murphy might have asked how much personal property was on the Pier,

noting that "I can't say that he didn't. I referred him to my attorney because I had no knowledge of it." Tr. 265. Murphy admitted that he couldn't actually remember specifically asking Attorney Hrycay for a list of personal property and was not certain that he had asked him. Tr. 126. On direct examination, Attorney Hrycay stated that he didn't recall Murphy "ever specifically asking about personal property." Tr. 377.

The Court finds the testimony credible that Murphy asked David Lewis for a list of personal property and Lewis referred him to Attorney Hrycay. Based on Attorney Hrycay's denial that he was asked by Murphy for the list and, given Murphy's own uncertainty about this request, the Court finds that Murphy failed to follow up in asking Attorney Hrycay for this list. The Court, however, finds credible Murphy's testimony that he asked Nat Golzbein for a list of personal property but was told that it was not worth anything.

David Lewis testified that he did not attempt to assess, even on paper, approximately how much personal property PPI had rights in and was taking possession of. Tr. 256. He added that PPI probably never attempted to inventory personal property on the Pier. Tr. 256–57. Moreover, he had no idea, even a ballpark estimate, of the value of the personal property sold with the Pier. Tr. 264, 268.[28]

Similarly, Allen Hrycay stated that neither he nor PPI took steps to inventory the personal property. Tr. 373. During a tour of the Pier on August 24, 1989,[29] he relied

27. Murphy stated that, although he couldn't remember what he did to determine what the personal property was, he was certain that he did pursue it. *Id.*

28. Similarly, Nat Golzbein testified that he made no attempt to inventory the personal property once he took over the Pier. Tr. 327. He did not ask for a list of the personal property from PPI. *Id.*

29. Dana Relyea from the SBA testified that he made a field visit of the Pier on August 24, 1989 when he met with Paul Golzbein and Allen Hrycay to conduct an inventory of the personal property. He used a list of the Pier property in which the SBA had a first security interest to

conduct this inventory. Tr. 204; Ex. 11. This list was created in 1983 in the context of a settlement agreement arising from the Chapter 11 bankruptcy of Defendant CP. Tr. 232. He found that "most of the collateral could not be properly identified or if there was a conflict we would not know whose was who [sic]." Tr. 205, 235. Most of the items on the list, including the more expensive items such as a photocopier and cash register, were not found. Tr. 229. He concluded that SBA's collateral position had relatively little value and that it was fairly represented by the $2,500 compromise. Tr. 235.

Under cross-examination, he admitted that they didn't "examine every inch of the pier" and that he has no knowledge of "whether those items on that list may have been there at the

entirely on Paul Golzbein to determine which property on the Pier belonged to the tenants as well as that in which PPI had first security interest. Tr. 374. Attorney Hrycay acknowledged that he still has no idea of the value of the personal property in which PPI had a security interest that was sold or attempted to be sold with the Pier at the auction. Tr. 380.[30] CP testified that she was never asked about personal property on the Pier by either Paul or Nat Golzbein, Attorney Hrycay's office or PPI, or anyone from SBA. Tr. 416–17.

With respect to the appraisal report, Royal Associates, a company specializing in real estate appraisal, was hired by PPI to conduct an appraisal of the pier property. PLC's Facts, ¶ 24. The principal of Royal Associates, Robert E. Royal, conducted the appraisal and drafted the appraisal report. He is an expert real estate appraiser within the meaning of Rule 702 of the Federal Rules of Evidence. *Id.*, ¶ 26. Attorney Hrycay furnished Royal with copies of the lease with PLC as well as the fifteen subleases.

Royal inspected the Pier on September 6, 1989. Tr. 379; Ex. 120. Royal used a figure of $300,000, which represented the total income from the rental of space on the Pier obtained by the lessee from subleases. PLC's Facts, ¶ 27. Attorney Hrycay did not ask for an appraisal of personal property on the Pier and, as a result, the appraisal did not purport to appraise the value of the personal property. Tr. 267, 380. The appraisal report stated:

> This valuation includes both the fair market value and liquidation value of only the improvements that are a part of the

Old Orchard Pier but does not include the value of any personal property on the Pier. In other words, this valuation includes only the estimated fair market value and liquidation value of the Pier and buildings with related utilities but *does not include any personal property items that may be located on the Pier.*

Ex. 93; Tr. 267–68 (emphasis added). The appraisal report, dated September 22, 1989, concluded that, as of September 12, 1989, the date of the auction, the property had a fair market value of $700,000 and a liquidation value of $450,000. Tr. 380; Ex. 120.

■ The Court is not bound by the independent appraiser's opinion of the fair market value of the mortgaged property. *See Kennebec Savings Bank v. Chandler,* 447 A.2d 824, 826 (Me.1982). In *Kennebec Savings Bank,* the Law Court noted:

> [T]he Defendant first argues that 14 M.R.S.A. § 6324 requires the Superior Court to adopt an independent appraiser's opinion of the fair market value of the mortgaged property without any modification whatsoever. We find no statutory basis for such a limitation upon the Court's fact-finding authority.

*Id.* The Court does not feel compelled to adopt the appraisal report as the dispositive measure of the fair market value of the Pier at the time of the foreclosure auction. The Court agrees with Defendants' assessment that the appraisal, in fact, does *not* accurately measure the fair market value of the Pier because of the absence of any valuation of the Pier's personal property.[31]

---

time the Piers [sic] Leasing Company took over the pier the spring of '89." Tr. 236.

**30.** Attorney Hrycay estimated that he thought that the property was worth "maybe 10,000, $20,000," adding that he had no qualification to give an opinion as to the value of personal property. Tr. 381. When asked why he thought it was worth so little, he responded:

> Well, a number of reasons. I went down and walked around and saw what was there. It looked like most of it was pretty old, had been used quite often, you know, there was a lot of items. For example, in the restaurant building, chairs and tables or restaurant equipment, unless a prospective buyer wanted to

operate that type of business, all they would have would be the expense of trying to remove them and see if they had a salvage value and sell it to somebody else. One of [the] discussion[s] with Relyea [about] the reason they took 25 hundred dollars for the property[;] it was less than the cost of removing it and selling it separately.

Tr. 381.

**31.** The Court finds no merit, however, in Defendants' claim that the appraisal report is "tainted" because it was issued after the auction was concluded. *See* Defendants' Post–Trial Brief at 20. Royal inspected the Pier on September 6, 1989 and concluded that, as of September 12,

Pursuant to Maine law,[32] in the absence of any independent appraiser's determination of the value of the personal property, the Court must determine the fair market value of such property based upon "objective and, arguably, more accurate data."[33] The parties provided little data at trial that the Court can construe as "objective." Although CP estimated that she spent at least $250,000 on personal property for the Pier between the bankruptcy in 1984 and the changing of the Pier's locks in March of 1989, Tr. 419, she provided absolutely no documentation for such purported expenditures. Under cross-examination, when asked whether she had receipts for the purported $250,000 worth of personal property, she responded: "Well, I have some, I'm sure, somewhere." Tr. 446.[34] The Court assumes that if Defendants wanted to and could substantiate CP's assertion, they would have provided available documentation, such as receipts. In light of the limited credibility of CP's testimony, coupled with the virtual absence of any documentation, the Court refuses to find that the value of the personal property was approximately $250,000.

Two witnesses estimated the value of the personal property. See Allen Hrycay, Tr. 381 ("I don't think it was worth very much, maybe 10,000, $20,000, but I have no qualification to give an opinion as to the value of personal property."); Paul Golzbein, Tr. 466 ("There is probably in the neighborhood, of used equipment, there's a lot of used equipment there, in the neighborhood 20, tops $25,000 if you were lucky to get that much."). Neither Allen Hrycay nor Paul Golzbein are qualified to render expert opinions on the value of the Pier's personal property.

The only "objective" or even "arguably, more accurate" data arose from the assessment of the Pier's personal property by the

---

1989, the property had a fair market value of $700,000. Tr. 379–80; Ex. 120. Defendants provide no authority to support their implied contention that the appraisal report should have been issued before the auction.

The Court also rejects Defendants' assertion that the appraisal report's determination of the fair market value of the property itself is understated. Defendants attempt to substantiate this claim based on such factors as PLC's insuring the Pier for $1,000,000 when it executed its lease with PPI in April of 1989, SBA's and the auctioneer's projection that the Pier would bring over $1,000,000, and PLC's actual purchase of the Pier for over $1,000,000. See Defendants' Post–Trial Brief at 21. Defendants conclude that these factors are evidence of market value that contradicts the appraiser's estimate. Id.

The Court rejects Defendants' argument and it accepts the appraisal's report of the fair market value of the Pier. It notes, however, that the Pier's fair market value should have included its personal property.

**32.** With respect to the Court's determination of fair market value, the Law Court has noted:

> The purpose of the provision in 14 M.R.S.A. § 6324, that an independent appraisal be used to establish the fair market value of the property at the time of the sale, is to ensure that the court's determination of fair market value is based upon objective and, arguably, more accurate data. Where, as here, the mortgagee is the highest bidder at the public sale, the sale price might not accurately reflect the fair market value of the property.

*Kennebec Savings Bank,* 447 A.2d at 826.

**33.** In describing its basis for determining the fair market value of the property in *Kennebec Savings Bank,* the Law Court noted:

> Where the court bases its determination of the deficiency judgment upon objective data of the property's fair market value, the statutory provision "as established by an independent appraisal" is satisfied. As was the case here, the objective data may have been obtained from the reports and testimony of one or more independent appraisers. The court need not accept in full or in part the conclusions of the independent appraisers who testify as to the fair market value of the mortgaged property. In establishing the property's fair market value, the court may evaluate and weigh those expert opinions and the data which support them.

447 A.2d at 826 (citations omitted).

**34.** CP testified that, to her knowledge, most of the items on Exhibit A (a list of personal properties that was transferred in 1984 and used by the SBA in conducting its inventory in August of 1989), and Exhibit B (a list of some of the items owned by OOOPCo that CP believed were turned over to the Pier Trust and were at least in part, on the Pier in February, 1984 when the list was drawn), and all additional purchases, totalling $250,000, were still on the Pier when PPI came to the Pier and changed the locks, exclusive of a copier and one broken oven. Tr. 418–19.

Under cross-examination by Attorney O'Brien of SBA, CP admitted that the SBA was to obtain a security interest in certain items of personal property (listed on Exhibit A) that formerly belonged to CDP Inc. Tr. 430.

SBA. With respect to assessing the value of personal property, Dan Relyea testified:

> We are charged with finding a value that makes sense to us and bear in mind I'm not a licensed appraiser, if there is such a thing, so we generally will get appraisals on a certain class of collaterals and which I can use as a guideline or reinforce my own thought or hire such expert people as we deem necessary.

Tr. 199. The SBA had a first security interest in certain personal property on the Pier [35] and a second security interest in other personal property on the Pier.[36] Exs. 11, 19. The SBA indicated in a letter dated September 6, 1989 to Attorney Hrycay that it would release its first security position for a sum of $2,500. Tr. 202; 220–22.

The Court finds that the SBA's assessment of the personal property,[37] albeit incomplete in reflecting only the first, and not the second, security interest, is the only available objective data of the value of the Pier's personal property. The Court adopts this value in concluding that the personal property on the Pier was worth $2,500. In adopting this value, the Court

exercises its right under Maine law to modify the independent appraisal of the Pier. It concludes that the amount of $2,500 should have been added to the appraised fair market value of the Pier property— $700,000—for a revised total of $702,500 to reflect the adjusted fair market value of the Pier. The Court therefore reduces the amount of Defendants' deficiency judgment by $2,500, based on the modification of the fair market value of the Pier.[38]

### C. *The Auction*

The public foreclosure auction was conducted at the Pier on September 12, 1989. PLC's Facts, ¶ 22. Prior to the auction, David Lewis, Jerome Goldberg, attorney for the estate of George Lewis and trustee of the George I. Lewis trust,[39] and Allen Hrycay decided that they would not let the Pier be sold for less than $1,000,000 at the sale. PLC's Facts, ¶ 23. PLC decided in August 1989 that it would bid up to $600,000. It believed that it could raise $600,000 toward the purchase price, $400,000 of which would come from a line of credit with an interest rate of around thirteen percent. The remainder of the money

---

**35.** According to Relyea, the list of personal property in which SBA had a first security interest "was generated or reconstructed rather, from the bankruptcy, at some point in the bankruptcy in 1983." Tr. 200.

**36.** According to Relyea, he never saw a list for the personal property in which SBA had a second security interest. Tr. 201.

**37.** With respect to the valuing of the personal property, Relyea testified as follows:

[By Mr. Woodworth]
Q When you met with Mr. Golzbein and Mr. Hrycay, the purpose of the meeting was to determine if any of these items on the list were on the pier at the time the Golzbeins leased the pier at the beginning of the summer of '89; is that correct?
A Well the purpose of the visit was to determine whether those items were on the pier at the time of my visit.
Q And the conclusion that you drew was that most of the items were not; is that correct?
A Correct.
Q And that items described in that list, or that the SBA's collateral position was basically worthless; is that correct?
A I don't know if I want to characterize it as the property to be worthless, it had some value.
Q Very little value?

A Relative term, but it in relation to size of the loan it was relatively be small; yes.
THE COURT: Was it fairly represented by the 25 hundred dollar compromise in your judgment?
A Yes.
Tr. 235.

**38.** The deficiency is reduced, based on 14 M.R.S.A. § 6324, which states in pertinent part:

> In the event the mortgagee has been the purchaser at the public sale, any deficiency shall be limited to the difference between *the fair market value of the premises at the time of the public sale,* as established by an independent appraisal, and the sum due the mortgagee as established by the court with interest plus the expenses incurred in making the sale.

*Id.* (emphasis added).
Because the Court has modified the fair market value of the Pier from $700,000 to $702,500, the calculation of the deficiency judgment must be adjusted accordingly. Based on the increase in the fair market value of the Pier by $2,500, the deficiency judgment is reduced correspondingly by the same amount.

**39.** The George I. Lewis trust will be the ultimate beneficiary of monies collected pursuant to this litigation. Tr. 449.

would have come from friends of Nat Golzbein who were willing to lend money at twelve percent and from financial contributions from Nat and Paul Golzbein. PLC's Facts, ¶ 19; Tr. 33–34, 358.

Approximately 200 to 300 people attended the auction. PLC's Facts, ¶ 22. Bidders were required to show $100,000 in cash or certified funds to bid with the highest bidder being required to pay the balance in full by cash or certified funds within thirty days. Only six bidders, including PPI and PLC, registered.

The bidding started at $500,000 and three bidders, including PLC, raised their paddles. *Id.* PLC made a bid of $600,000. *Id.* The bidding progressed to a point where William Danton bid $825,000. *Id.* PPI then bid $850,000. When no further bids were received, the auctioneer announced a recess to allow bidders an opportunity to bid higher. The auction then resumed and when there were no further bids, the auctioneer announced that PPI was the highest bidder.

Attorney Ronald Caron testified that, at the time that the auctioneer's hammer came down, he observed Paul Golzbein, who was standing with his mother, look over to see that Lewis was the high bidder and exclaim "That's all right, don't worry about it, we have it." Tr. 170. Attorney Caron noted that Paul Golzbein made this statement two or three times. *Id.* Similarly, Edward Simpson, who was standing with Attorney Caron, observed Paul Golzbein state rather emphatically to a woman a couple times, "We got it. We got it." Tr. 179. Paul Golzbein denied making either of these exact statements. He admitted to talking to his mother after the auction but testified that he stated to her, "He's got it now," referring to David Lewis. Tr. 469–70.

The Court credits Mr. Golzbein's testimony on this point. Apparently, Attorney Caron and Mr. Simpson heard similar, but not identical, statements from Golzbein. Given the phonetic similarity between the words "we" and "he" in Golzbein's purported statement, which was heard at some distance by Simpson and Caron, the Court resolves this factual dispute in favor of Golzbein.

### D. *Post–Auction Activity*

■ At the end of October or beginning of November, Paul Golzbein contacted David Lewis and Attorney Hrycay about leasing the Pier for 1990. Tr. 364. Golzbein testified that he originally went there "under the assumption that we could talk to them about leasing the Pier, again, from them." Tr. 365. At the first meeting, PPI made it clear that they would prefer to sell, not lease, the Pier. Tr. 365, 368. Golzbein testified at that point they "started talking about a few numbers." Tr. 368. At the second meeting, PPI started to talk concretely about financing the Pier and "then numbers and negotiations started going back and forth from that point." Tr. 369. According to Golzbein, "it was pretty clear and out in the open that if we were going to buy it for the kind of numbers they were talking about, financing would be made available by them." Tr. 369. In December of 1989, PPI and PLC reached an agreement in which PPI would sell the Pier to PLC for $1,050,000. It was agreed verbally that PLC would pay $100,000 in cash at the closing. The remaining $950,000 was to be paid in the form of a note payable over a seven-year period with interest at the rate of 8.187 percent. Pursuant to the terms of the note, PLC was required to pay PPI $125,000 a year beginning in July of 1990 with a final balloon payment of $510,-000 payable in July 1997. PLC's Facts, ¶ 31.[40] After a verbal agreement was reached between PPI and PLC in December 1989, PLC asked its counsel, Rick Lawrence, to prepare the necessary paperwork evidencing the sale. PLC's Facts, ¶ 33. During January of 1990, Allen Hrycay, on behalf of PPI, and Rick Lawrence, on behalf of PLC, prepared a written Purchase and Sales Agreement. The first draft of the Agreement was forwarded by Allen

---

**40.** The financial terms of the agreement are set forth in notes of Paul Golzbein dated December 18, 1989. Ex. 85.

Hrycay to Rick Lawrence by letter dated January 5, 1990. The Agreement was signed and dated February 9, 1990. PLC's Facts, ¶ 34; Ex. 58.

On February 23, 1990, PLC executed a promissory note in the amount of $950,000, Exhibit 76, and Nat and Paul Golzbein executed a personal guarantee pursuant to which the obligations of PLC under the $950,000 note to PPI were guaranteed. PLC's Facts, ¶ 34; Ex. 41. On the same date, PPI executed both a quitclaim deed conveying title to the Pier to PLC, Exhibit 27, and a Mortgage and Security Agreement. Ex. 41. Although the promissory note, personal guarantee, deed, and mortgage and security agreement were executed on February 23, 1990, the transaction did not close on that day because of the existence of title defects. Specifically, a concern was raised over the existence of a right of first refusal and whether a portion of the Pier was subject to the Submerged Lands Act of the State of Maine. PLC's Facts, ¶ 37; Tr. 457. These documents were held in escrow, and the closing was not completed until both of these title defects were resolved in early April of 1990 to the satisfaction of Rick Lawrence and Stewart Title Insurance Company, the Company providing the title insurance. On April 5, 1991, escrow was broken and the transaction was finalized. PLC's Facts, ¶ 38; Tr. 457–58.

With respect to other interested buyers, Attorney Richard Poulos called David Lewis on behalf of CP on February 15 or 16, 1990 to inquire as to whether it was still possible for her to negotiate with Lewis to buy the Pier. Tr. 186–87. According to Poulos, Lewis stated that he would be happy to talk with her; nothing had been settled yet. Tr. 187.

CP testified that she met with Lewis on the last day of February or the first day of March, 1990. Tr. 425. She asked him if the Pier had been sold and he stated that it had not. He told her that several parties

were interested and confirmed the names of some of those parties, adding that nobody wanted to come up with any money. When CP indicated that she had been approached by a group of individuals who were interested, he told her to have their attorney, Thomas Blackburn, contact him. Tr. 425–26.

Blackburn did contact Lewis during the first week of March, 1990, indicating that he had a client that was interested in acquiring the Pier. Blackburn stated that he wanted to make sure that the Pier was available and to discuss the possible terms of a purchase. Lewis indicated that he should put this in a letter and Blackburn did so. Tr. 191–92. Blackburn followed up with a telephone call approximately five to seven days after the first conversation to ensure that Lewis had received the letter. Lewis indicated that he had not, apparently because the address was incorrect. Lewis gave him the correct address and Blackburn mailed another letter to him. Approximately ten days after the second phone call, Blackburn followed up again. Lewis informed him that the Pier was under option, which was expiring at the end of the month, and that he would call Blackburn at that time. Blackburn testified that he never heard from Lewis. Tr. 192–94.

The Court finds that PPI continued to tell interested parties that the Pier was available up until the closing was complete in early April, 1990. The Court, however, does not find that PPI's actions indicate a dishonest attempt to keep the agreement with PLC secret and, by implication, reflect a fraudulent pact between PPI and PLC.[41] Rather, PPI's actions are construed as reflecting sound business judgment in the context of the negotiated transaction with PLC and the effort to close that transaction by resolving the title defects without foreclosing PPI's ability to come back to other interested parties if the closing could not be finalized.

41. PPI has no legal obligation in respect to its subsequent resale of the property after its acquisition of title at the foreclosure sale to deal with property in any particular manner or to consider overtures of any prospective buyers. This conduct is put forth by Defendants only as circumstantial evidence of the formation of a hidden purchase and sale agreement between PPI and PLC prior to foreclosure sale.

Defendants have failed to meet their burden of proving fraud in the conduct of the foreclosure sale by clear and convincing evidence. The Court concludes that the foreclosure sale complied with the Maine Mortgage Foreclosure statute, 14 M.R.S.A. § 6324, in which the Pier was sold to the highest bidder—PPI—at a public sale. Therefore, the Court will dismiss Defendants' Counterclaim and will not set aside the foreclosure sale.

### E. *Attorney's Fees*

■ This Court has noted that:

[W]hen seeking attorney's fees plaintiffs' attorneys must submit a full and accurate accounting of their time; the accounting must be based on contemporaneous records; and the accounting must give specifics such as the dates and nature of the work performed. The record should be sufficiently detailed to enable the Court to determine what time was spent on claims on which the plaintiffs did not prevail. The record must also be detailed enough to enable the Court to determine if plaintiffs' attorney is claiming compensation for hours that are redundant, excessive, or otherwise unnecessary, and to determine if the attorney has exercised "billing judgment" in submitting the fee application.

*Inmates of Maine State Prison v. Zitnay,* 590 F.Supp. 979, 985 (D.Me.1984). In *Zitnay,* its "unique circumstances ... prompt[ed] this Court to be somewhat more lenient than it would otherwise be." *Id.* The Court noted that "[t]he underlying action was of great importance in assuring that the State of Maine continued to meet its obligation to provide at least minimally humane prisons, and the case was handled by counsel without compensation at a high level of competence over an extended period of years." *Id.*[42] Here, no such "unique circumstances" present themselves, and the Court will not be lenient.

PPI has had three opportunities to account for and justify the amounts claimed as their reasonable attorney's fees. They have failed each time to do so. Initially, PPI failed to set forth any substantiation of the claimed amount in attorney's fees in its original Report of Sale. After Defendants' objection, which the Court sustained, PPI furnished invoices for the claimed fees in its Second Report of Sale. In objecting to that submission, Defendants noted that the bills could not be reconciled with the figures sought. The Court's March 19, 1991 Order specifically instructed PPI to file another (third) Report of Sale that was "full, complete, and comprehensible." [43]

At trial, the parties noted miscalculations and discrepancies in the accounting of attorney's fees in the Third Report of Sale. Tr. 157–68; 247–52; 297–98; 304–05; 382–406. The Court suggested that the parties attempt to demonstrate the amount sought in the attorney's fees in their post-trial briefs. Tr. 394. Even after the parties' post-trial attempt to reconcile the fee discrepancies, the Court finds that discrepancies still exist.[44] Accordingly, the Court

---

**42.** The Court also found special circumstances in the case of *Hall v. Auburn,* 567 F.Supp. 1222, 1229 (D.Me.1983). There, the Court noted that:

[T]he underlying action was one of great significance to the development of Maine's sex discrimination law. It was handled without fee at a high level of competence. In addition, the time records presented to this Court, while perhaps reflecting an inadequate understanding of the rigorous scrutiny to which fee petitions are generally subject, clearly and unequivocally demonstrate that plaintiffs' counsel are acting in good faith and with circumspection concerning the amount of fees sought.

*Id.*

**43.** PPI argues that, because Defendants failed to object to these fees and costs at the time of the

Motion for Summary Judgment and therefore have waived their right to challenge them, PPI is entitled to these fees and costs. PPI's Post–Trial Brief at 13. The Court finds that Plaintiff's argument has no merit and rejects it.

**44.** PPI revised its original calculation of $52,-016.22 in attorney's fees and determined that these fees should be reduced to $45,958.37. PPI's Post–Trial Brief at 14. This revision reflects a reduction in attorney's fees in the amount of $6,057.85. PPI states, however, that the reduction is $6,417.85, not $6,057.85. *Id.* This results in a $360 discrepancy in their own calculations.

In contrast, Defendants calculated a total of $44,958.37 in attorney's fees. Defendants' Post–Trial Brief at 25. The Court finds that Defendants' calculation of revised attorney's fees to-

concludes that, in light of the Court's clear and absolute demand in its March, 1991 Order that PPI adequately document or explain their accounting in its Third Report of Sale, and PPI's failure to do so, in respect to recoverable attorney's fees, the Court denies PPI's entire demand for attorney's fees.[45]

### III. SUMMARY

In sum, the Court concludes that Defendants have failed to meet their burden in proving by clear and convincing evidence that PPI's and PLC's conduct was fraudulent, based either on a pre-auction agreement or underreporting or misrepresentation of Pier income. Although the Court recognizes that "[f]raud is nearly always a matter of inference from circumstances," *Atlas Shoe Co. v. Bechard*, 102 Me. 197, 203, 66 A. 390 (Me.1906), the inferences drawn from the circumstances highlighted and detailed here by Defendants are insufficient to meet the heavy burden that they bear in providing clear and convincing evidence of fraud. Such circumstantial evidence of fraud is insufficient to meet the standard of proof applicable to overturn a judicial sale for fraud.

First, the Court finds that Defendants fail to prove by clear and convincing evidence that PPI made a false representation of the Pier's lease income to the auctioneer and, hence, failed to prove the first element of its fraud claim. As noted earlier, the Court found that PPI provided the auctioneer, Joseph Murphy, with the income information he requested by furnishing him with the fifteen subleases. In this regard, the Court finds that PPI made a true representation of the Pier's lease income as sought by the auctioneer in furnishing the subleases in which the total lease income was $193,500.[46]

Second, the Court finds that Defendants failed to meet their burden to prove that PPI and PLC completed a pre-auction purchase agreement of the Pier. The Court questioned the credibility of some of Defendants' witnesses, notably CP, Ms. Girard, and Mr. Plante, who testified in support of the existence of such an agreement. Given both the highly circumstantial and questionable evidence and the limited credibility of these witnesses, the Court first gives little weight to the alleged discussions that these witnesses purportedly had, or witnessed, in which Bernard and David Lewis or Nat and Paul Golzbein "alluded to" a pre-auction agreement. *See* Defendants' Post–Trial Brief at 5.

Further, Defendants' other purported evidence of a pre-auction agreement, including Nat Golzbein's business decisions surrounding the foreclosure auction and subsequent purchase of the Pier and the alleged "secrecy" of that purchase until the closing in April of 1989, is too tenuous and speculative to meet the heavy burden borne by Defendants in proving their allegations of fraud. In short, Defendants' circumstantial evidence of fraud does not rise to the level of clear and convincing evidence.

The Court concludes that the foreclosure sale complied with the Maine Mortgage Foreclosure statute, 14 M.R.S.A. § 6324, in which the Pier was properly sold to the highest bidder—PPI—at a public sale. Therefore, the Court will dismiss Defendants' Counterclaim and will not set aside the foreclosure sale.

The Court does find that Plaintiff's Third Report of Sale is deficient on two grounds,

taling $44,958.37 is correct. Therefore, the attorney's fees would be reduced in the amount of $7,057.85 ($52,016.22 − $44,958.37), not $6,057.85 (or $6,417.85).

Once again, PPI has failed to provide an accurate accounting of its reasonable attorney's fees.

**45.** The Court will not, however, allow Defendants "to file a Bill of Costs, including a statement of their reasonable attorneys' fees incurred in contesting the Reports of Sale and in conducting the recent trial as their damages resulting from the fraud." *See* Defendants'

Post–Trial Brief at 18; *see also id.* at 26 ("Award Defendants legal fees for costs incurred in challenging, not once but three times, a facially deficient Report of Sale"). In terms of fees arising from conducting the recent trial, the Court will assess no fees on behalf of Defendants because it concluded that no fraud was perpetrated.

**46.** As noted previously, Attorney Hrycay was unaware of the oral leases of the summer of 1989, totalling $43,500 in lease income, until the time of the trial. Tr. 408.

namely, the failure of the attached appraisal report to include the value of the Pier's personal property and the improper accounting of attorney's fees in Exhibit A.[47] Although the Court will not reject the Third Report of Sale, it will reduce the amount of the deficiency judgment by $59,981.13, based on its valuation of the personal property in the amount of $2,500.00, its denial of attorney's fees in the amount of $52,016.72, and the parties' joint stipulation in the amount of $5,464.41.[48]

## IV. ORDER

Accordingly, it is hereby ORDERED that Defendants' Counterclaim be, and it is hereby, DISMISSED, and that Plaintiff's deficiency judgment be, and it is hereby, reduced in the amount of Fifty–Nine Thousand Nine Hundred Eighty–One Dollars and Thirteen Cents ($59,981.13), for a total deficiency judgment of Eighty–Nine Thousand Eighty–Nine Dollars and Seventeen Cents ($89,089.17), plus continuing interest[49] through date of judgment, judgment to enter forthwith.

**47.** Although the foreclosure auction was held on September 12, 1989, PPI did not file its Report of Sale until August 29, 1990. Tr. 300–01. PPI argues that it could not file a Report of Sale until the end of the SBA's redemption period, which was one year. Tr. 298–99; *see also* Ex. 2. As pointed out by Defendants, however, PPI's explanation is belied by two facts: first, PPI filed its Report of Sale and second, SBA demanded that the Report of Sale be filed during that time, prior to the expiration of the redemption period. Tr. 219–21; 301; *see also* Defendants' Post–Trial Brief at 16.

Mr. O'Brien first sent a letter to Attorney Hrycay approximately two months after the auction, asking whether a report of sale had been filed and, if so, that a copy of the report be sent to him. Tr. 219; Ex. 66. Mr. Choate of SBA then sent a follow-up letter in April of 1990, asking Mr. Hrycay to respond with SBA's request for a report of sale. Tr. 220–21; Ex. 65. This letter stated: "I hope it will not become necessary to get a court order to compel an accounting." Tr. 221. Attorney Hrycay sent a letter dated April 26, 1990 that, according to Mr. Relyea, was "a ... draft of the report of sale." Tr. 221–22. The actual report of sale, however, was dated August 27, 1990 and filed with the Court on August 29, 1990. Tr. 300–01.

Although the Court acknowledges that 14 M.R.S.A. § 6324 does not provide an explicit limitations period for filing a report of sale, the Court finds that PPI waited an inordinately long time before filing its Report of Sale, notwithstanding the SBA's one-year right of redemption under 28 U.S.C. § 2410.

**48.** Plaintiff stated in its Trial Brief that "[t]he parties have stipulated that the Plaintiff received the sum of $5,464.41 on July 27, 1989 from a subtenant of Old Orchard Pier Company which should be used to reduce the sum owed to Plaintiff by the Defendants." Plaintiff's Trial Brief at 2.

**49.** Defendants noted in their Trial Brief that, among other issues, they expected to present to the Court the issue of "whether the entire litigation could have been brought to a conclusion sooner, thus reducing the amount of interest due on all charges for which interest has been sought by Poultry Processing." Defendants' Trial Brief at 13. Similarly, Defendants noted in their Post–Trial Brief that their "obligations to the PPI should be frozen in time as of the date of summary judgment since all delay and costs since then have been the result of PPI's fraud." Defendants' Post–Trial Brief at 18. The Court acknowledges the unnecessarily long delays in PPI's filing of its Report of Sale with the Court and the avoidable delays arising from subsequent amendments to the original Report of Sale due to PPI's deficiencies in filing these Reports of Sale. The Court has concluded, however, that PPI did not engage in any fraudulent conduct. It rejects Defendants' request and assesses continuing interest charges as part of the final judgment.